**SOUTH–SUBURBAN HOUSING CENTER, an Illinois not-for-profit corporation, Counter–Defendant 7–21–84,**

v.

**GREATER SOUTH SUBURBAN BOARD OF REALTORS, an Illinois not-for-profit corporation, National Association of Realtors, an Illinois not-for-profit corporation, Counter–Plaintiffs, Cross–Plaintiffs,**

v.

**CITY OF BLUE ISLAND, Village of Calumet Park, City of Country Club Hills, Village of Glenwood, Village of Hazel Crest, Village of Matteson, Village of Park Forest, Village of Richton Park, Village of University Park, Counter–Defendants.**

No. 83 C 8149.

United States District Court,
N.D. Illinois, E.D.

Dec. 19, 1988.

As Corrected April 27, 1989.

Robert C. Johnson, C. Mark Kingseed,
Sonnenschein, Carlin, Nath & Rosenthal,

Alexander L. Polikoff, John R. Hammell, Chicago, Ill., for plaintiffs.

John B. Murphy, Ancel, Glink, Diamond, Murphy & Cope, P.C., Chicago, Ill., for Village of Hazel Crest, City of Country Club Hills, Village of Matteson, Village of Richton Park, Village of Park Forest.

Paul L. Pawlowski, Ronald I. Kammer, Hinshaw, Culbertson, Mollmann, Hoban & Fuller, P.C., Chicago, Ill., for Country Club Hills.

Philip C. Stahl, Darrell J. Graham, Grippo & Elden, Chicago, Ill., for Greater South Suburban Bd. of Realtors and National Ass'n of Realtors.

Cary A. Horvath, Chicago, Ill., for Village of Calumet Park.

Thomas S. Moore, Frank K. Neidhart, Jr., McCarthy, Duffy, Neidhart & Snakard, Chicago, Ill., for Village of University Park.

James R. Schirott, John T. Elsner, Schirott & Elsner, Itasca, Ill., Richard Hoskins, Thomas Quinn, Barbara Hermansen, Schiff, Hardin & Waite, Chicago, Ill., for Blue Island, Glenwood & University Park.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEINENWEBER, District Judge.

### COMPLAINT

### FINDINGS OF FACT [1]

1. Plaintiff in this action is the South Suburban Housing Center, an Illinois not-for-profit corporation ("SSHC" or "Housing Center"). The SSHC carries on its activities within a Chicago, Illinois suburban area that is described in No. 4 of these Findings of Fact. The SSHC states that its purposes are to "promote and encourage multi-racial communities in the South Suburbs" of Chicago and "promote open housing to all people regardless of race." (Tr. 170, 346–47, Klepper; PX23) The SSHC's activities include providing assistance to homeseekers, "testing" for discriminatory real estate practices and suing those found to be engaged in such practices, conducting fair housing educational programs for realtors, apartment rental agents and the public, and assisting various government units in carrying out fair housing efforts. (Tr. 190–92, 215, 253–59, 266–67, 259–61, 286–89, Klepper) Christine Klepper ("Klepper") has been the Executive Director of the SSHC from 1980 to the present. (Tr. 190, Klepper)

2. The first named of two defendants in this action is the Greater South Suburban Board of Realtors [2] (the "GSSBR" or the "Board"). The GSSBR, an Illinois not-for-profit corporation, is an association of licensed real estate brokers and salesmen and a local affiliate of the other named defendant in this action, the National Association of Realtors ("NAR"). (Counterclaim, ¶ 3) The GSSBR carries on its activities within approximately the same Chicago, Illinois suburban area in which the SSHC operates, and operates therein a real estate multiple listing service ("MLS") that is described in Nos. 25–27 of these Findings of Fact. Robert Turpin ("Turpin") was Executive Vice President of the GSSBR for "close to twenty years" and the chief operating officer of the GSSBR MLS at all times relevant to this action. (Tr. 625–27)

3. The second named defendant in this action is the NAR, an Illinois not-for-profit corporation, and an association of licensed real estate brokers and salesmen which provides policy guidance and materials and services of various sorts to its local affiliates, including the GSSBR. (Counterclaim, ¶ 2; Tr. 1471–80, North) William D.

---

1. To the extent that any of the Findings of Fact reflect legal conclusions, they shall be deemed Conclusions of Law; and, to the extent that any of the Conclusions of Law reflect factual findings, they shall be deemed Findings of Fact.

2. "Realtor" is a federally registered collective mark owned by the National Association of Realtors and is properly used only in reference to members of the Association. Howeve⌐ of violation of trademark law, the term⌐ is used in this opinion to include a⌐ engaged in the sale or lease of real⌐

North ("North") was Senior Vice President and General Counsel of the NAR from 1980 to 1986, at which time he became Executive Vice President of the NAR. (Tr. 1459–63, 2114–15, North)

4. Both the SSHC and the GSSBR carry on their respective activities within approximately the same area in south Cook County and a small portion of northern Will County, Illinois. The area referred to (the "South Suburban Area") includes approximately thirty-seven municipalities and is bordered on the north by the southern border of the City of Chicago, on the west roughly by Harlem Avenue or Interstate 57, on the south roughly by the northern border of Will County (except that a few Will County communities are included in the South Suburban Area), and on the east by the Indiana state line. (Tr. 171–72, Klepper; Tr. 373–75, Pearson)

The South Suburban Area

5. As of 1970 the suburban communities south and southwest of Chicago had almost no black residents, including the communities immediately west and northwest of the South Suburban Area, Alsip, Burbank, Bridgeview, Chicago Ridge, Evergreen Park, Hickory Hills, Hometown, Oak Forest, Oak Lawn, Orland Park, Palos Hills, Palos Park, Palos Heights, Tinley Park, West Haven and Worth (collectively the "Southwest Suburban Area"). (MX500A; MX481A and 481C) In the South Suburban Area however several small communities, such as Robbins and Phoenix, had virtually all black populations from their inception; a few communities, such as Blue Island and Chicago Heights, had substantial black enclaves for many years; and a few others, such as Park Forest and University Park, had growing non-negligible black populations. *Id.*

6. During the period from 1970 to 1980 some communities in the central corridor of the South Suburban Area, directly south of the south side of Chicago, experienced substantial racial change while communities to the east and to the west continued to have negligible black populations. (Tr. 6843–48, Orfield; Tr. 1107–08, K. Williams; MX500A) For example, by 1980 the popu-

lation of University Park had become 44.3 percent black; the population of both Harvey and Markham had become about two-thirds black; and the population of Calumet Park and Chicago Heights had become 30 percent and 28.8 percent black, respectively. (MX500A) In municipalities immediately adjacent to these communities there was also significant racial change; the populations of Country Club Hills, Hazel Crest and Matteson each changed from less than one percent to approximately 12 percent black. *Id.*

During the same decade some communities in the eastern portion of the South Suburban Area and the entirety of the Southwest Suburban Area remained with negligible black populations. (Tr. 1107, K. Williams; Tr. 6845–46, Orfield; MX481A and 481B; MX500A) Racial enrollment data for elementary school districts indicates that since 1980 the same pattern of racial change has continued and in some cases accelerated in communities in the South Suburban Area, while the black population of the Southwest Suburban Area has remained negligible. (Tr. 6860–62, Orfield; MX480–81, 481A, D and E)

7. These racial settlement patterns in the South Suburban Area, where historically all white areas experience integration and are subsequently threatened with resegregation, result from a complex mix of market forces. These market forces include racial prejudice: some whites and some blacks prefer to live in segregated communities; the belief that high concentrations of blacks result in a drop in home values; the expectation that an integrated community will eventually become segregated; and housing search practices that are reinforced by certain real estate practices. (Tr. 621; 4483–84; 6809–10)

8. Certain real estate practices tend to exacerbate the problem. Realtors, like any salesmen, adopt marketing strategies that will maximize sales at minimum effort. For example, since realtors make more money selling in house listings, realtors push these houses. Since black realtors

tend to have listings from black clients[3] they tend to push listings in black or integrated neighborhoods to their prospects who also are mostly black. White realtors push listings in white neighborhoods to their white customers for the same reasons. (Tr. 350; 363; 1115; 7588–92).

Advertising strategies complement these sales efforts. Realtors advertise in the communities in which they expect to make the most sales. This means black realtors advertise in black communities and white realtors in white communities. (Tr. 73; 1115–16; 2653–61; 6069)

In short, realtors have little incentive in promoting integration for the sake of integration. They are interested in making sales. Accordingly, they are followers and not leaders of change in housing patterns.

9. In order to counter these market forces and to promote integrated living in the South Suburban Area, the SSHC has attempted to influence the housing market by encouraging the sales and marketing of real estate in what it terms to be "non-traditional" ways, i.e., encouraging whites to move to black or integrated areas and blacks to move to white or integrated areas. (Tr. 202–07)

### Plaintiff's Definition of "Affirmative Marketing"

10. "Affirmative Marketing", according to plaintiff, consists of race conscious efforts to promote integration or prevent segregation through special marketing of real estate to attract persons of particular racial classifications who are not likely to either be aware of the availability or express an interest in the real estate without such special efforts. Affirmative marketing is multi-racial in that it approves of and encourages efforts to attract whites to racially integrated areas as well as blacks to racially segregated areas. (PX27)

11. "Affirmative Marketing" insofar as it involves special outreach to whites is controversial and has among its most vociferous critics some mainline black organizations who feel that such marketing efforts stigmatize blacks and tend to make housing less available to blacks. (DX41; DX44; Tr. 615–616) Others, principally the realtors, contend that affirmative marketing to whites is "benign steering" and quite possibly illegal. (Tr. 1649–63) If, for example, realtors assess that special outreach to whites is appropriate, they contend that they could be prosecuted for steering if their assessment is determined to be inaccurate.

### The NAR/HUD Voluntary Affirmative Marketing Agreement

12. In 1979 the United States Department of Housing and Urban Development ("HUD") and the NAR executed a Voluntary Affirmative Marketing Agreement ("VAMA"). It provides an uniform approach to fair housing for NAR's boards and members. Acceptance of the VAMA eliminated the need for signatories to promulgate any other affirmative marketing plans but did not preclude them from doing so. (DX456)

13. The VAMA defines affirmative marketing "as a program to inform the *minority community* of the homes listed for sale or rent by Realtors, of the services offered by Realtors in selecting a home for purchase, and of the availability of these homes and services to all buyers without regard to race, color, religion, sex or national origin" (emphasis supplied). Thus the VAMA requires special outreach to minorities only. (DX456) This form of affirmative marketing is justified as remedial; i.e., to open areas that had previously been closed to minorities because of past discriminatory practices.

### The Apache Street Listings

14. William Motluck ("Motluck") of Century 21–Host Realty ("Host") was the broker with whom the SSHC listed the three Apache Street homes involved in this case. (Tr. 325, Klepper) Motluck and Host were participants in the MLS, paid all fees charged by the MLS and had entered

---

**3.** According to standard realtor nomenclature, a homeowner who gives a listing to a realtor is a "client"; a person seeking a home through a realtor is a "prospect"; as soon as a prospect makes an offer he becomes a "customer."

into agreements which bound them to comply with the MLS rules and regulations. (Answ. to complt., ¶¶ 13, 32) Motluck had performed the duties required of him under those agreements, including submission of his exclusive listings to the MLS. (DX549, p. 248)

15. The three homes involved in this action are on Apache Street, a horseshoe-shaped street of some forty-seven homes located in the northeast corner of the Eastgate subdivision in the Village of Park Forest, Illinois. (PX11; Tr. 141, Bean) Eastgate is bounded by Western Avenue on the west, 26th Street on the south, forest preserves on the east and the Beacon Hill and Forest Heights subdivisions of the City of Chicago Heights on the north. (PX11; Tr. 135–36, Bean)

16. Forest Heights subdivision, immediately north of the Apache Street area (MX582, pp. 364–65; PX11), was built beginning in 1970 and the majority of the homes were sold to blacks, many from Chicago's south and west side ghettos (MX582, p. 356) and by 1972 the population in Forest Heights was 99 percent black. *Id.* Racial turnover ensued in Beacon Hill, the subdivision immediately west of Forest Heights, which also adjoins Eastgate. *Id.*, pp. 355–56. (PX11) During 1970–1971 the Beacon Hill School which was a part of a Park Forest School District serving the Beacon Hills–Forest Heights area as well as parts of Park Forest, including Eastgate, had changed from 25 to 90 percent black and had become a racially identifiable school. It was the only such one in Park Forest School District 163. (MX582, p. 360)

17. The evidence also indicated that as black families moved onto Apache Street in the early 1970's rumors had begun to circulate that the Eastgate area was going black. Many whites wanted to sell their houses and brokers began to steer whites away from the area. *Id.*, p. 365. Although the situation stabilized by the time of the 1980 census, the census block including Apache Street (No. 207) had become over 56 percent black, more than double the black population of any other census block in Eastgate. (MX582, p. 365; PX18–19;

Tr. 149–51, 156, Bean; Tr. 1245, 1253, K. Williams; DX131)

18. At the time relevant to this action, homeseeking traffic on Apache Street was "predominately black" (Motluck dep., p. 95) and there had been very little white demand for housing for some time. (Tr. 322, Klepper) The real estate industry in Park Forest was "knowledgeable" about Apache Street and its "makeup" and perceived that Apache Street was "a black block" on which whites were underrepresented. (Tr. 637–44, Turpin)

19. VA and FHA mortgage foreclosures in Eastgate leading to abandoned homes and neighborhood blight were an ongoing problem. (Tr. 141, Bean) In response to this problem Park Forest began a program of acquiring vacant or abandoned homes, chiefly by purchase from the United States Department of Housing and Urban Development ("HUD") or the Veteran's Administration ("VA"), rehabilitating the homes, and then reselling them. (Tr. 141, Bean; PX12)

20. Pursuant to this program Park Forest in 1982 purchased the vacant homes at 9, 15 and 26 Apache Street (the "Apache Street homes") from HUD or the VA. (Tr. 141–42, Bean) In September of 1982 Park Forest published a notice seeking bidders to purchase, rehabilitate and resell the Apache Street homes. (PX13)

21. On September 23, 1982 the SSHC submitted a proposal to Park Forest for the acquisition, rehabilitation and resale of the Apache Street homes, including affirmative marketing. (PX14; Tr. 145–46, Bean) Based on its analysis of a variety of data the SSHC had determined that without special outreach efforts few white homeseekers would be attracted to the Apache Street homes. (Tr. 322–23, Klepper)

22. On November 1, 1982 the Park Forest Board of Trustees voted to accept the SSHC's proposal for the acquisition, rehabilitation and resale with affirmative marketing of the Apache Street homes. (Tr. 146, Bean; DX142A–C) The SSHC then bought the three Apache Street homes and began to rehabilitate them. (Tr. 323–24, Klepper)

23. The SSHC and Motluck then entered into listing agreements for the Apache Street homes. (PX15–17) The listing included an affirmative marketing plan ("AMP"). (Tr. 1240–43, 1249–50, K. Williams) The AMP provided that Motluck was to use his "best efforts to attract minority and majority persons" to the Apache Street homes (PX15–17; AMP, ¶ 1), make a special outreach to whites by advertising in newspapers with a predominately white circulation and distributing information to rental developments and employers where whites could be reached, *id.;* AMP, ¶ 3, and collect data on persons shown the homes, including their race. (*Id.;* AMP, ¶¶ 5, 7) The listings forbade "any action which prohibits, restricts, narrows or limits the housing choice of any client on the basis of race." (PX15–17; AMP, ¶ 4)

24. Through its village manager Park Forest reviewed and approved the Apache Street ·AMP as consistent with the Park Forest/SSHC contract. (Tr. 148–49, Bean)

25. The special outreach efforts provided for in the Apache Street listing agreements were to be carried out by Motluck alone; the agreements did not require other MLS participants, the MLS itself, or anyone other than Motluck to engage in special outreach activities. (PX15–17; Tr. 673, Turpin) No obligations were imposed upon MLS participants by inclusion of the Apache Street listings in the MLS; participants remained free to ignore the listings. (Tr. 660–62, Turpin) However, if a MLS participant chose to show Apache Street homes to a customer he was to provide Motluck with certain information about the customer, including race, either before or after the showing. (Tr. 1031–33, Klepper; PX15–17; AMP, ¶ 7) Lock boxes were provided for the Apache Street homes and all MLS participants had keys for such boxes which they could use to show the homes without any advance notice to Motluck. (Tr. 7492, Klepper)

26. The listing agreements for 9, 15 and 26 Apache Street were signed, respectively, on April 5th, April 10th and June 13, 1983. (PX15–17; Tr. 328, Klepper) Motluck submitted the listings to the MLS (Motluck dep., p. 34) and they were published in the MLS book. (PX55; Tr. 648–49, Turpin) The information which the MLS published concerning the Apache Street homes was exactly the kind of information published on all other homes listed (i.e., price, size, location, etc.); there was no reference in the MLS publication to affirmative marketing or special outreach. (PX55) The listings as published indicated that access to the homes was available by means of a lock box so that Realtors could enter and show the homes to homeseekers without contacting Motluck. (PX55; Tr. 7492, Klepper)

27. There was no evidence at all that the SSHC intended Motluck to reduce or that Motluck in any way reduced his efforts to market the Apache Street properties to blacks; in fact since his commission was contingent upon successfully marketing the properties to any purchaser regardless of color, and since homeseeking traffic in Eastgate was predominantly black, it would be easier to market the properties to blacks. Therefore he had a strong market incentive to market the properties in a way to reach the maximum number of blacks as well as whites.

### The GSSBR Multiple Listing Service

28. The Board operates a multiple listing service ("MLS") a facility by which a MLS member broker makes a blanket unilateral offer of subagency to all other MLS participants with respect to a home listed with that broker. (Tr. 1499–1500) The MLS computer database contains information about homes listed for sale with its members. MLS members and their homeseeking prospects can review this data via computer terminals or by reviewing printed compilations distributed to members on a bi-weekly basis. (Tr. 2638–39)

29. The GSSBR's MLS is governed by its rules and regulations which provide, *inter alia,* that for a fee and agreement to submit all listings to the MLS, the MLS shall be available to participating Realtors and that the MLS reserves the right to refuse to accept a listing which in the opinion of its legal counsel failed "to protect adequately the interest of the public and the participants." (DX34)

30. On June 24, 1983 the GSSBR, based upon advice of its legal counsel, Stuart Lindenberg ("Lindenberg"), removed the Apache Street listings from the MLS. The reason that the listings were removed was because in the opinion of Lindenberg they were very possibly illegal and would violate the MLS rules and regulations and the concern that the data collection under the listings might constitute illegal racial steering.

The court finds that the removal was done in good faith and was not a pretense for discrimination.

### Equal Opportunity Commission Complaint Against Motluck

31. On June 24, 1983 the Equal Opportunity Commission ("EOC") voted against Lindenberg's advice to file a complaint against Motluck pursuant to Article 10 of the NAR's Code of Ethics (Tr. 479–83, Pearson; Tr. 7423, Lindenberg), Article 10, which is intended to "track" the Fair Housing Act (Tr. 2202–04, North), provides:

"The Realtor shall not deny equal professional services to any person for reasons of race, creed, sex, or country of national origin. The Realtor shall not be party to any plan or agreement to discriminate against a person or persons on the basis of race, creed, sex, or country of national origin."

(PX48, p. 29).

32. The EOC voted to file its complaint against Motluck because the Apache Street agreements called for "special outreach ... to whites rather than to minorities." (Tr. 479–82, 491, Pearson) The EOC's position, based upon the HUD/NAR VAMA, was that special outreach to white homeseekers gave rise to a violation of Article 10. (Tr. 483–84, 486–87, Pearson)

33. Turpin was present during the EOC meeting of June 24, 1982. (Tr. 480, Pearson) On that day, after the EOC voted to file its complaint against Motluck, Turpin withdrew the Apache Street listings from the MLS. (Answ. to complt., ¶ 19; Tr. 676, Turpin)

The court finds that the filing of the complaint was done in good faith and not a pretense for discrimination.

### Indemnification Agreement

34. Some time after the withdrawal of the listings from MLS, very late in June or early July, Turpin first contacted North about the listings. (Tr. 1649–50, North) Turpin then sent North a copy of the Apache Street listings. (Tr. 1650, North) North examined the listings, but with other documents (Tr. 2510–11), and then drafted an Indemnification Agreement ("Agreement"). (Tr. 1670, North; PX44) The Agreement began as follows:

"WHEREAS, Century 21–Host Realty [i.e., Motluck's company] requires its subagents to employ race-conscious criteria provided by the South Suburban Housing Center ('SSHC') when determining which prospective buyers to introduce to property owned by the SSHC and listed with Century 21–Host Realty; and

"WHEREAS, the Greater South Suburban Board of REALTORS, Inc. ('the Board') is concerned that the use of such criteria may violate federal or state fair housing laws or the Illinois real estate licensing law ...' "

(PX44, p. 1) The Agreement called upon the SSHC and Motluck's company to indemnify the GSSBR and its members from all liability, including damages, costs, attorney's fees and other expenses by reason of any legal proceeding arising out of the Apache Street listings. (PX44, pp. 1–2)

35. On July 5, 1983 North sent Turpin a letter enclosing the Agreement (DX162) and a letter stating the NAR's recommendation that the GSSBR allow MLS access for the Apache Street listings only upon condition that the Housing Center and Motluck sign the agreement. *Id.* At trial North said that his "concerns" respecting the Apache Street listings (Tr. 1650–69) led him to recommend indemnification because he believed the listings could lead to "legal liability" or "potential exposure" of the MLS or MLS participants under legal prohibitions against steering. (Tr. 1671–72)

36. The justification advanced by defendants for thus conditioning MLS access for

the Apache Street listings was North's asserted belief that the listings called for actions which "likely" were racial steering and therefore could lead to "legal liability" or "potential exposure" for the MLS or MLS participants.

The court finds that this justification was made in good faith and was not a pretense for discrimination.

### Plaintiff's Claims

37. The Housing Center asserts that defendants have violated its rights under Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.* (the Fair Housing Act), and at common law through their treatment of certain real estate listings (the "Apache Street listings" described in No. 23 of these Findings of Fact), particularly because (1) the GSSBR threatened the Housing Center's broker and then brought a formal ethics complaint against him for entering into the Apache Street listings, (2) for a time the GSSBR unconditionally denied the Apache Street listings access to its MLS, and (3) thereafter defendants conditioned access to the MLS for such listings upon a requirement that the Housing Center and its broker indemnify the GSSBR and its members from all liability and expenses occasioned by any legal proceeding out of the Apache Street listings.

## CONCLUSIONS OF LAW

### I. Jurisdiction

1. This court has jurisdiction over the subject matter of this action and counterclaim pursuant to 42 U.S.C. §§ 3612, 3617; 28 U.S.C. §§ 1331, 1334; 42 U.S.C. §§ 1982, 1983; 28 U.S.C. §§ 2201–02; and upon this court's pendent jurisdiction.

### I. Fair Housing Act Claims

#### A. *Section 3604(a)*

2. Section 3604(a) of the Fair Housing Act makes it unlawful "[to] ... make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin ..." 42 U.S.C. § 3604(a) There are two recognized methods of proving a Section 3604(a) violation: by proving discriminatory intent or by proving discriminatory effect. *Metropolitan, etc. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977).

#### (i) Intent

■ 3. The actions of defendants were motivated by other than discriminatory intent; the actions of defendants were motivated by a strong philosophical disagreement as well as a deep concern for the legality of the Apache Street listings' AMP. Although the court upholds the legality and constitutionality of the Apache Street AMP (Conclusion No. 8, *infra,* pp. 1087–88), there was substantial room for disagreement, on both the legal and the philosophical front. In any event there was insufficient evidence to establish that defendants' concerns over illegality were a pretense for discrimination.

#### (ii) Effects

4. *Arlington Heights* provides the Section 3604(a) standard when, as here, a plaintiff alleges that racially-neutral behavior created a discriminatory effect. *See, Phillips v. Hunter Trails Community Assn.,* 685 F.2d 184, 189 (7th Cir.1982). The four *Arlington Heights* factors to be considered are:

1) the strength of the showing of discriminatory effect;

2) some evidence of discriminatory intent;

3) the party's interest in taking the action complained of; and

4) whether the plaintiff seeks to compel the defendant to affirmatively further, or merely keep the defendant from interfering with, the fair housing activity.

*Arlington Heights,* 558 F.2d at 1290.

■ 5. There are two different ways a facially-neutral decision can produce a discriminatory effect: (a) when that action has a greater adverse impact on one racial group than another; or (b) when the decision "perpetuates segregation." *Id.*

■ 6. The actions of defendants did not have a racially disparate impact on white homeseekers in the south suburbs. The purpose of plaintiff's affirmative marketing with special outreach to whites was

**1080**

to increase the likelihood that whites would view the Apache Street properties in numbers beyond what would be expected if normal marketing techniques were used. Therefore plaintiff's affirmative marketing itself has a racially disparate impact. To the extent that defendants' activities may decrease the impact of affirmative marketing would not itself equal disparate impact.

■ 7. The inability of Motluck to use the MLS did not perpetuate segregation. Plaintiff and its broker were free to continue with their special outreach activities. The actions of defendants in denying use of its MLS if anything would make it more difficult to sell the homes to blacks because cooperating brokers had no affirmative marketing obligations themselves and were knowledgeable about Apache Street, its racial and demographical makeup, and that there was little white demand. (Findings of Fact, ¶ 13)

■ 8. The uncontradicted testimony of Turpin, Lindenberg, and others established that close adherence to the VAMA and their fear of being charged with racial steering motivated the Board's refusal to participate in the Apache Street plan. (Findings of Fact, ¶ 30). Defendants' desire to comply with the VAMA is a substantial interest deserving of deference from the court. *See, Hennessey v. NCCA,* 564 F.2d 1136, 1142–43 (5th Cir.1977) (holding that where collegiate athletic association was formed, in part, to adopt rules to govern its members, it was inappropriate for the court to reject the association's reasonable interpretation of its own bylaws.)

Defendants' attempt to avoid liability for the Apache Street plan in what was perceived to be uncertain legal terrain is a legitimate and normal precautionary practice. Therefore the interest of defendants in taking the actions complained of was legitimate and not a pretense for discrimination.

■ 9. Although the relief sought, the inclusion of certain listing agreements into defendants' MLS, seeks to compel defendants to assist in its affirmative marketing activities, the intrusion is not severe.

However this factor is not determinative. *Arlington Heights,* at 1295.

10. Accordingly, the court finds that plaintiff has failed to prove a violation of Section 3604(a) under either intent or effects analysis.

### B. *Section 3606*

■ Section 3606 of the Fair Housing Act proscribes the denial or conditioning of access to a MLS "on account of race." 42 U.S.C. § 3606. Defendants' actions were not racially motivated. The requested indemnification was for reasons which were not pretextual for racial discrimination. The court therefore finds that defendants' actions did not violate Section 3606 on this claim for the same reasons as those stated with respect to the SSHC's claim under Section 3604(a).

### C. *Section 3617*

■ 11. Section 3617 of the Fair Housing Act prohibits interference with the enjoyment of fair housing rights. 42 U.S.C. § 3617. But that section does not under the circumstances of this case provide an independent ground for liability. In *Arlington Heights* the Seventh Circuit noted that "where the conduct that allegedly violated Section 3617 is the same conduct that allegedly violated Section 3604(a) and was engaged in by the same party, the validity of the section 3617 claim depends upon whether the [conduct] violated section 3604(a)." 558 F.2d at 1288 n. 5. *See,* also, *Atkins v. Robinson,* 545 F.Supp. 852, 865 (E.D.Va.1982), *aff'd* 733 F.2d 318 (4th Cir. 1984). Consequently, since the SSHC failed to establish that the NAR and the GSSBR's actions violated Sections 3606 or 3604(a), its claim under Section 3617 also fails.

### II. Breach of Contract

■ 12. The SSHC also alleges that it was a third-party beneficiary of an "agreement" between Motluck and the MLS and that the Board breached that "contract" by requesting indemnification from Motluck and the SSHC.

13. However the SSHC did not establish an essential element of its third-party beneficiary claim, breach of contract between GSSBR and Motluck. The MLS rules and regulations do not require the GSSBR to publish whatever listings Motluck chose to submit. Section 12 clearly states that the MLS through its legal counsel may "refuse to accept a listing form which fails to protect adequately the interests of the public and the participants." This provision granted the GSSBR discretion to act as it did with respect to the Apache Street listings when, as here, the court found that the decision of the legal counsel was not pretextual. (Findings of Fact, ¶ 27; Conclusions of Law, ¶ 3) Thus, even if the SSHC was a third-party beneficiary of the alleged "MLS contract," its breach of contract claim would lose under the express terms of the MLS rules. *See, R & L Grain Co. v. Chgo. Eastern Corp.*, 531 F.Supp. 201, 209 (N.D.Ill.1981).

### III. Tortious Interference

14. In order to prove a claim for tortious interference with prospective economic advantage, a party must establish the following elements: (1) a reasonable expectancy of an economic advantage (here entering into contracts for the sale of homes); (2) knowledge of the expectancy by defendants; (3) the intentional wrongful interference with the expectancy; and (4) damages resulting from defendants' actions. *Knapp v. McCoy*, 548 F.Supp. 1115, 1117 (N.D.Ill.1982); *Tom Olesker's Exciting World of Fashion v. Dun & Bradstreet, Inc.*, 16 Ill.App.3d 709, 306 N.E.2d 549, 553 (1st Dist.1973), *rev'd in part on other grounds*, 61 Ill.2d 129, 334 N.E.2d 160 (1975).

15. The SSHC has failed to show that defendants' alleged interference was "wrongful" or intended to injure the SSHC. *See, R.H. Donnelley Corp. v. IBT*, 595 F.Supp. 1202, 1208 (N.D.Ill.1984). Defendants' motive was not to interfere with the SSHC's attempts to sell the Apache Street homes; they wanted to protect the Board and its MLS participants from exposure to suit or liability. Since defendants were pursuing legitimate business and legal interests when they acted on the Apache Street plan, their actions do not approach the level of legal malice required to sustain the SSHC's claim. *Bank Computer v. Continental Ill. Nat. Bank*, 110 Ill.App.3d 492, 66 Ill.Dec. 160, 167, 442 N.E.2d 586, 593 (1982). *See, Petit v. Cuneo*, 290 Ill. App. 16, 22, 7 N.E.2d 774, 777 (1st Dist. 1937) ("one who has an interest may take action to protect his rights.")

Accordingly, Counts I, II and III of plaintiff's complaint are dismissed.

### COUNTERCLAIM

### FINDINGS OF FACT[4]

#### I. Parties

1. Counterplaintiffs in this action are the Greater South Suburban Board of Realtors ("GSSBR") and the National Association of Realtors ("NAR") (collectively "counterplaintiffs" or "Realtors").

As a professional association of real estate brokers and salesmen, the NAR's organizational goals are to (1) help its members understand and comply with laws governing the sale of housing—in particular fair housing laws—thereby reducing its members' risk of violating such laws, (2) promote its members and the profession, and (3) establish a free and open housing market which operates without regard to race. (Tr. 1475–76) The NAR has invested substantial time and money in developing a comprehensive program to attain these goals. That program includes establishing bylaws, regulations and training programs that assist Realtors in complying with fair housing laws (Findings of Fact, ¶¶ 3–6), entering into the NAR's VAMA (Findings of Fact, ¶¶ 7–9), and assisting members in challenging regulations and legislation that unconstitutionally restrict Realtors' or the public's right to a market founded on the principles of equal opportunity and free choice. (Tr. 1577–83; DX78)

---

4. The court adopts the Findings of Fact on the complaint and the Findings of Fact on the counterclaim to the extent they are relevant.

2. In addition to counterdefendant South Suburban Housing Center ("SSHC" or "Housing Center"), there are five remaining municipal counterdefendants (or "municipalities") in this case: the City of Country Club Hills, the Village of Glenwood, the Village of Hazel Crest, the Village of Matteson and the Village of Park Forest. A sixth municipality—the Village of University Park—is in the case only with respect to counterplaintiffs' challenge of its "for sale" sign regulation.[5]

3. Country Club Hills has a city form of government, with a mayor elected at large and eight alderman elected, two from each of four wards. (Tr.6498) It is located in the central corridor of the South Suburbs, bordered by Markham, Flossmoor, Hazel Crest and unincorporated areas. (MX481) As of 1980 Country Club Hills' population was approximately 14,767—eighty-four percent white and twelve percent black. (MX500A) It has twelve subdivisions (MX510A) and approximately three thousand owner-occupied and twelve hundred renter-occupied households. (MX478K, Table 26)

4. Hazel Crest was incorporated in 1912. It has a village form of government, with a president and board of trustees elected at large and a village manager. (Tr.6321) It is also located in the central corridor of the South Suburbs, bordered by Markham, Harvey, East Hazel Crest, Homewood, Flossmoor and Country Club Hills. (Tr.6322; MX481) As of 1980 Hazel Crest's population was approximately 14,-000—eighty-six percent white and twelve percent black. (MX500A) The present population is still estimated to be 14,000, of which now sixty to sixty-five percent is white and twenty-five to thirty percent is black. (Tr.6278–79; 6360–61) Hazel Crest has ten subdivisions and approximately thirty eight hundred owner-occupied and

approximately six hundred sixty renter-occupied households. (MX478T, Table 26)

5. Glenwood was originally settled in 1835 and incorporated in 1903. (Tr.5745) It has a village form of government, with six trustees and a mayor elected at-large. (Tr.5741–42) Glenwood is also located in the central corridor of the South Suburbs, approximately bordered by Thornton, Homewood, Flossmoor and Chicago Heights, with Cook County forest preserves around its remaining borders. (MX481) In 1980 Glenwood's population was approximately 10,500—eighty-nine percent white and ten percent black. (MX500A) Glenwood's current population is still estimated to be 10,500—approximately eighty to eighty-five percent white and fifteen to twenty percent black. (Tr. 5746; 5753) Glenwood has five subdivisions and approximately twenty three hundred single family homes, seven hundred condominiums and four to five hundred apartment units. (Tr.3360; 3687; 5743–45; MX478R, Table 26)

6. Matteson has a village form of government, with a president, board of trustees and village manager. Matteson is located in the southern half of the central corridor in the South Suburbs and is bordered by Olympia Fields, Park Forest and Richton Park. (MX481) In 1980 Matteson's population was 10,233—of which approximately twelve percent was black and eighty-three percent white. (MX500A) Matteson has eight neighborhoods or subdivisions (MX251–58) and approximately twenty five hundred owner-occupied and seven hundred renter-occupied households. (MX478AA, Table 26)

7. Park Forest was initially developed in 1947 and incorporated in 1949. (Tr.4976) Park Forest has a village form of government with a board of trustees, village pres-

---

**5.** There were originally nine municipal counterdefendants in the case. To streamline adjudication and because of the similarity of purpose and effect of challenged ordinances and programs among the nine municipal counterdefendants, the court entered two agreed orders on September 1, 1987. These orders provided that, with respect to the municipalities of Blue Island, Calumet Park, Richton Park and (except

with respect to its real estate sign ordinance) University Park, the court would "make no findings and grant no relief" in this case, in return for which each of those four municipalities agreed to abide by any relief granted by the court against the remaining municipal counterdefendants which related to an ordinance in effect in substantially identical form in any of the four municipalities.

ident and village manager. It is located at the south end of the central corridor in the South Suburbs, bordered by Chicago Heights, Olympia Fields, Matteson, Richton Park and University Park. (MX481) In 1980 Park Forest's population was approximately 26,000—eighty-eight percent white and twelve percent black. (MX500A) While its population is still the same the composition it is now approximately eighty-three percent white and seventeen percent black. (Tr.4979; 4981) There are fifty five hundred single family homes, twenty three hundred co-ops or condominium townhouses, six hundred thirty townhomes and seven hundred high-rise rental units in Park Forest. (Tr.4990)

8. University Park has a village form of government and is located at the far southern end of the central corridor in the South Suburbs. (MX481) It is bordered by Park Forest, Richton Park, Monee and unincorporated areas. (MX481) As of 1980 University Park's population was 6,245—fifty-three and one-half percent white and forty-four and three tenths percent black. (MX500A) Within its borders there are approximately twelve hundred forty owner-occupied and eight hundred twenty renter-occupied households. (MX478WW, Table 26)

## II. Nature of the Action

9. Counterplaintiffs' second amended counterclaim is a six-count attack against the fair housing policies of the SSHC and certain fair housing and other policies and ordinances of the municipalities. As set forth below, not all counts seek relief against every counterdefendant. Count I alleges that the Apache Street AMP of counterdefendants SSHC and Park Forest violates the Fair Housing Act and Sections 1982 and 1983 of the Civil Rights Act. Count II asserts that the so-called "integration maintenance" programs of all counterdefendants are a pattern and practice of racial steering and discrimination which violates the Fair Housing Act, the Constitutional right of equal protection and Sections 1982 and 1983. Count III attacks Hazel Crest's "for sale" sign ban and the sign placement and size regulations of

Country Club Hills, Matteson, Park Forest and University Park, alleging that those ordinances violate the First Amendment, the Fair Housing Act and Sections 1982 and 1983. Count IV is directed against the solicitation ordinances of the municipal counterdefendants and alleges that those ordinances, both facially and as applied, violate the First Amendment, due process and equal protection, Sections 1982 and 1983 and the Fair Housing Act. Count V alleges that Glenwood and Matteson's fair housing data reporting ordinances violate privacy rights, equal protection and due process, the First Amendment, Sections 1982 and 1983 and the Fair Housing Act. Count VI alleges that profit/not-for-profit distinctions in the fair housing ordinances of the municipal counterdefendants violate equal protection and Section 1983 and are preempted by Section 3615 of the Fair Housing Act.

10. Although the counterclaim originally sought damages as well as equitable relief, counterplaintiffs withdrew their damage claims at the commencement of trial and never offered any evidence as to damages. Consequently only claims for declaratory and injunctive relief remain with respect to each count.

## CONCLUSIONS OF LAW

### I. Standing of the NAR and the GSSBR

▄ 1. The NAR and the Board have standing under Article III of the Constitution and Title VIII to assert their counterclaims because they have allegedly suffered a distinct and palpable injury that is fairly traceable to counterdefendants' conduct and because relief from the injury would be likely to follow from a favorable decision. *See, Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 261–62, 97 S.Ct. 555, 561–62, 50 L.Ed.2d 450 (1977). Counterdefendants' programs and ordinances allegedly impair the NAR and the Board's ability to attain their organizational goals by interfering with their activities, policies and programs and causing a consequent drain on their resources. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380, 102 S.Ct. 1114, 1125, 71 L.Ed.2d

214 (1982). In addition they have standing as representatives of their members because they satisfy the three requirements for representational standing: (1) their members have standing; (2) the interests the NAR and the Board seek to protect are genuine to their organizational purpose; and (3) neither the claims asserted nor the relief requested requires the participation of individual members. *Hunt v. Washington Apple Advertising Comm.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Counterdefendants' arguments as to standing tend to go to the merits of counterplaintiff's claims rather than to the nature of the injury complained of. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

2. Counterplaintiffs also have standing to assert claims under Sections 1982 and 1983 because of the allegations that counterdefendants' actions interfere with the right to market real estate to blacks. Here counterplaintiffs have taken steps to develop and implement its VAMA which they allege is being undermined by counterdefendants. *Warth v. Seldin*, 107 S.Ct. at 2210.

Prudential considerations have also been met. Here the alleged injury is specific to counterdefendants' members whose rights are being asserted. *Warth*, p. 2206.

### FINDINGS OF FACT
### COUNTS I and II

1. The SSHC conducts the following programs that are objected to by counterplaintiffs.

#### a. *Assistance to Homeseekers*

Counterplaintiffs apparently do not challenge the SSHC's assistance to black south suburban residents victimized by racial harassment, nor the SSHC's efforts to help CHA families, mainly black, find housing in the south suburbs. These activities are plainly inconsistent with a purpose of restricting the number of black South Suburban Area residents.

Although the counterclaim (¶ 35c) refers to homeseeker "counseling services sponsored by either SSHC or the municipalities," counterplaintiffs' counsel indicated at trial they are not attacking some part or all of the SSHC Homeseekers Service ("Service"). (Tr.7506) In any event, the evidence indicates that the SSHC's Service "is a supplement to the normal housing market" which any homeseeker may use if he chooses. (Tr.209, Klepper) The Service provides the same assistance to blacks or whites, although the "traditional" and "nontraditional" choices which are discussed with blacks and whites differ because, given the normal housing search patterns, blacks are unlikely to consider all white areas and whites are unlikely to consider all black or rapidly integrating areas. (Tr.7296–97, Matthews; Tr.201–02, 208–09, Klepper; Tr.5371–74, Cardona)

The SSHC makes "clear to everyone" assisted by the Service that "[t]he final choice is always that of the individual." (Tr.209, Klepper; PX23; PX96) Service clients are asked to read cards which explain the SSHC's policy and state "SSHC works with homeseekers individually to expand options to include the total marketplace," and "the final choice is always that of the individual." (PX23; PX96) If homeseekers decide "they want traditional housing listings, we will give them those ..." (Tr.208, Klepper) Ultimately, a "few more families make nontraditional moves than traditional." (Tr.211, Klepper)

#### b. *Testing and Compliance Activities*

The evidence indicates that the SSHC's testing and litigation activities have been designed to "open up" housing options and combat discrimination, particularly with respect to blacks. Although the counterclaim asserts that SSHC tests are used "to force Realtors to comply with ... integration maintenance programs" (counterclaim, ¶ 35(b)), counterplaintiffs' counsel withdrew that allegation during the trial. (Tr.7508–12)

#### c. *Educational Activities*

Counterplaintiffs apparently do not challenge many of the SSHC's educational activities, including those designed to inform Realtors and the public about fair housing laws. Counterplaintiffs do appear to challenge the SSHC's education about affirma-

tive marketing. (Counterclaim, ¶ 35(d)) Respecting such activities, the evidence indicates that the SSHC "... always says[s] affirmative marketing is absolutely not to limit anybody's housing choice. It's to do exactly the opposite." (Tr.268, Klepper) SSHC literature distributed to Realtors during seminars states "Affirmative Marketing is assisting homeseekers individually to expand options to include the total marketplace ... The final choice is always that of the individual." (PX27) The evidence indicates that during the seminars the SSHC stresses that "you never take anything away from somebody. You only add something," and the goal should be "100 percent of the people competing for 100 percent of the housing." (Tr.220, 226, Klepper) Although several hundred GSSBR Realtors have attended SSHC seminars (Tr.228, Klepper), counterplaintiffs offered no evidence from any Realtor that the SSHC's message has ever been different.

Similarly, the SSHC's guide for apartment managers and rental agents (PX29) states:

"Affirmative Marketing is a method of providing *information* to racial groups least likely to apply for housing ... The goal: to promote racially diverse traffic and demand for housing." (PX29, p. 3)

"Affirmative Marketing has nothing to do with racial 'quotas.' No person can be lawfully denied access to the housing of his or her choice because of race. The legitimate function of promoting residential racial diversity cannot be done by limiting the options of individuals." (PX29, p. 11)

The principles embodied in the quoted language are always part of the information about Affirmative Marketing that the SSHC gives to rental agents. (Tr.255, Klepper)

#### d. *Apache Street*

The SSHC's stated purpose in entering into and implementing the Apache Street listings was to add some "white traffic to the properties in addition to the black traffic," not to decrease or restrict the black traffic. The relevant evidence supports a finding that that was in fact the SSHC's purpose. (Cmplt., Findings of Fact, ¶ 27)

#### e. *SSHC Activities in General*

Respecting all of the SSHC's activities, Klepper testified:

"We [are] about encouraging racial diversity. We are about promoting demand from blacks and whites in housing ... Whatever the racial makeup of the community turns out to be, whatever it is, as long as it is the result of free choice, people making fully informed decisions, not decisions based on past discrimination, not decisions based on past discriminatory housing practices, not based on fears, not based on perceptions, you know, true free choice; and whatever the community turns out to be is what it turns out to be ...

"We're talking about ending a dual housing market where people do not have free choice. That is what we're talking about. Expanded housing opportunities.

"We are not about restricting anybody's housing choice. We make recommendations to expand housing choice ... It doesn't mean if you suggest to a black family something in addition to University Park that you don't offer University Park. You don't take anything away. You add something ..."

2. The court finds that the effect of the SSHC activities has not been to "restrict" or "control" access to housing but rather to expand the information about housing available for consideration by homeseekers and to promote racially diverse living and the prevention of resegregation.

3. In addition to the foregoing, the complaint attacks the foregoing as being elements of municipal "integration maintenance programs." (Counterclaim, ¶¶ 25–31, 35) The evidence presented at trial demonstrated that the SSHC (and not the municipalities) has controlled and implemented most of the programs challenged. The specific municipal efforts appear to be advertising and marketing campaigns of Hazel Crest, Matteson and Glenwood.

4. There was no evidence presented that the purpose of any advertising or mar-

keting efforts was to deny equal housing opportunity, restrict access to housing, manipulate choice, or otherwise impose a quota on any racial group. Instead, the efforts were directed to providing information to those felt less likely to consider housing in those suburbs and thus to promote integrated living.

5. These efforts also, to the extent that housing demand is increased as a result of such efforts, has a beneficial effect on the real estate business in general and homeowners and brokers in particular.

## CONCLUSIONS OF LAW
### COUNTS I and II

1. Counterplaintiffs are the GSSBR and the NAR, the defendants to the complaint. Counterdefendants under Count I of the counterclaim are the SSHC and the Village of Park Forest. Counterdefendants under Count II of the counterclaim are the SSHC and nine municipalities (including Park Forest), all of which are located in the South Suburban area.

2. It is a fundamental national policy to promote stable, long-term racial diversity in the communities of the United States. As the Supreme Court repeatedly has said, " '[t]here can be no question about the importance' to a community of 'promoting stable, racially integrated housing.' " *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 111, 99 S.Ct. 1601, 1613, 60 L.Ed.2d 66 (1979), quoting *Linmark Assocs., Inc. v. Willingboro Twsp.*, 431 U.S. 85, 94, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977). The Seventh Circuit observed in the *Arlington Heights* decision: "[The Fair Housing] Act was intended to promote 'open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat.' " *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1289 (7th Cir.1977), *cert. denied* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (hereinafter referred to as *Arlington Heights II* ), quoting *Otero v. NY City Housing Authority*, 484 F.2d 1122, 1134 (2nd Cir.1973). The national

commitment to the promotion of integrated housing has long been emphasized by the Supreme Court. *See, e.g., Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 368, 34 L.Ed.2d 415 (1972) (perpetuation of segregation can be as deleterious as purposefully discriminatory conduct in frustrating national commitment "to replace the ghettos 'by truly integrated and balanced living quarters' ".)

3. This national commitment requires special attention to the needs of an integrated community threatened with resegregation. As the Supreme Court said in *Gladstone*, 441 U.S. at 110, 99 S.Ct. at 1613, the "adverse consequences attendant upon a 'changing' neighborhood" are often "profound." These harms basically "flow from the realities of a racially segregated community" and include a reduction in homebuying demand, the diminishment of the tax base, a threat to the ability of the community to bear the costs of local government and to provide essential services and the loss of the positive benefits of living in an integrated community. *Id.* at 110–11, 99 S.Ct. at 1613–14.

4. The *types* of activities the SSHC engages in which counterplaintiffs challenge—Affirmative Marketing, Testing, Counseling, and Realtor Training (counterclaim, ¶ 35)—are all *per se* lawful:

(a) *Affirmative Marketing.* For the reasons given affirmative marketing is a lawful activity. (See Conclusion No. 8, *infra*, p. 1087)

(b) *Testing.* The Court of Appeals for the Seventh Circuit has noted that courts "have repeatedly approved and sanctioned the role of 'testers' in racial discrimination cases," and "the evidence provided by testers is frequently valuable, if not indispensable." *Richardson v. Howard*, 712 F.2d 319, 321 (7th Cir.1983).

(c) *Counseling/Assistance to Homeseekers.* Providing homeseekers with information about additional housing options, in particular options which would promote integration, is lawful for the same reason affirmative mar-

keting is lawful—it does not deny or "otherwise make unavailable" any housing to anyone. *See*, also, the NAR's statements that "encouragement of integration ... [is] consistent with the national housing policy." (PX52, p. 45; PX53, p. 15)

(d) *Realtor Training.* Patently it is not unlawful for a fair housing center to exercise its First Amendment rights to provide educational seminars for Realtors who choose to attend.

5. Thus the issue on the counterclaim with regard to the SSHC is not the Center's stated purpose of promoting integration, nor the types of programs it employs to pursue that purpose. Rather, the issue is whether the SSHC's specific implementation of its programs which counterplaintiffs call "integration maintenance" is in some respect unlawful. The court will examine counterplaintiffs' claims to this effect under the Fair Housing Act in Parts a and b below, and their claims under 42 U.S.C. §§ 1982 and 1983 in Parts c and d respectively.

### a. *Fair Housing Claims—Effects Analysis*

6. A Fair Housing Act violation may be established by means of an "effects" analysis involving four factors:

(1) the effect of challenged conduct (whether it perpetuates segregation or has a greater adverse impact on one racial group than another);

(2) some evidence of discriminatory intent;

(3) the "interest" of the defendant in taking the challenged action; and

(4) the nature of the relief plaintiff seeks.

*Arlington Heights*, at 1290–93.

7. The alleged invidious effect of the SSHC programs "is to enforce [SSHC's]

preferred population mix" or "quota" (counterclaim, ¶ 24), thus "restricting access to housing, with minority home buyers and renters shouldering most of the burden." *Id.*, ¶ 22. The court concludes that counterplaintiffs have failed to show any such effect of the SSHC's programs. As in *Steptoe v. Beverly Area Planning Assn.*, 674 F.Supp. 1313 (N.D.Ill.1987), the SSHC's activities do not "affect detrimentally the availability of housing" because they "do not deprive anyone of ... housing information," but "served to increase, not decrease, the existing supply of housing information," and its "practice of fully informing homeseekers of its policy avoided the dangers inherent in the typical steering situation ..." *Steptoe, supra* at 1319, 1320.[6]

8. The main thrust of counterplaintiffs case was the assault against "affirmative marketing" adopted by counterdefendant, the SSHC, for use in the Apache Street AMP. (See Findings of Fact, Nos. 10 and 23, complt.) The court concludes that such affirmative marketing does not have the effect of a greater adverse impact on one racial group than another.

Since affirmative marketing does not contemplate the lessening of normal marketing activities designed to reach the racial group most likely to be attracted to the property in question, there is little adverse impact on the availability of the housing in question.[7]

Such measures are temporary in nature: to be used only in efforts to integrate segregated housing or to prevent resegregation of integrated housing. When integration occurs or the threat of resegregation abates affirmative marketing would no longer be necessary. There was no evidence submitted that affirmative marketing was being used to prevent integration or encourage resegregation; on the con-

---

**6.** The court notes that the housing center in *Steptoe* helped only homeseekers interested in making non-traditional moves, *id.* at 1315, while the SSHC helps all homeseekers.

**7.** Except to the extent that wider marketing than normal would increase the number of people who would be aware of the availability of the property, increasing the likelihood that the property will be sold sooner or at a higher price. However since plaintiff's form of affirmative marketing works both ways, i.e., requires special marketing efforts to attract blacks to white areas and whites to black areas, the disparate impact is lessened if non-existent.

trary, all of the evidence indicated that the opposite was the case.[8]

9. Counterplaintiffs' allegation respecting the second *Arlington Heights* factor of intent is that the SSHC's intent is to limit homeseekers' housing choices: "restrict[ ] access to housing", *id.,* ¶ 22; "manipulate the racial composition of the homeseeker traffic", *id.,* ¶ 24; "control the movement and distribution of minorities", *id.,* ¶ 33. The court concludes that counterplaintiffs have failed to prove those allegations. The activities of the SSHC are carefully designed not to modify "normal" homeseeking activities or limit anyone's housing choices.

10. The third *Arlington Heights* factor is counterdefendants' interest in taking the challenged action. Although the SSHC is a private entity, in taking the actions of which counterplaintiffs complain the SSHC is not "seeking to protect private rights", *Arlington Heights,* p. 1293, so as to render its interest inconsequential. Rather, the SSHC seeks to further what Congress and the courts have recognized is an important national goal of promoting stable, racially integrated housing. Many SSHC programs are undertaken in cooperation with or at the behest of government bodies. Thus the SSHC's activities are infused with a strong public interest that should be accorded considerable weight. Under the circumstances, the third *Arlington Heights* factor also weighs the SSHC's favor.

11. The fourth *Arlington Heights* factor, the nature of the relief plaintiff seeks, was posed in terms of whether the plaintiff sought to "compel the defendant to ... take affirmative steps to ensure that integrated housing is built," rather than merely "to enjoin the defendant from interfering with that construction." *Arlington Heights,* at 1293. The underlying principle was a desire to avoid "a massive judicial intrusion on private autonomy." *Id.*

Here counterplaintiffs seek relief that goes far beyond enjoining the SSHC from "interfering" with a particular construction project. They ask the court to permanently enjoin virtually all of the the SSHC's programs, including but not limited to affirmative marketing, testing, counseling and Realtor training. (Counterclaim, ¶ 35, p. 14) This would be "a massive judicial intrusion" on SSHC autonomy. Moreover, such intrusion would shut down efforts to promote integration—precisely the kind of efforts the *Arlington Heights* decision was designed to protect.

Therefore the court concludes that the fourth *Arlington Heights* factor weighs in favor of the SSHC.

12. In this case, since all four *Arlington Heights* factors support the SSHC, the court concludes that counterplaintiffs have failed to prove an "effects" case under the Fair Housing Act.

### b. *Fair Housing Claim—Intent Analysis*

13. To establish an "intent" case counterplaintiffs must prove that the SSHC denied or made housing unavailable to a person or persons because of race, or otherwise "directly" and "detrimentally" affected the availability of housing because of race. *Steptoe, supra* at 1319; *Phillips v. Hunter Trails Comm. Assn.,* 685 F.2d 184, 199 (7th Cir.1982).

Since counterplaintiffs offered no evidence respecting any persons who sought to purchase or rent homes and who were denied that right by the SSHC, or that the SSHC denied or made housing available to anyone, or in any way restricted or limited anyone's housing choice, the court concludes that counterplaintiffs have failed to prove an "intent" case under the Fair Housing Act.

### c. *Section 1982 Claim*

14. Section 1982 provides:

VIII in efforts to promote integrated housing. We hold only that title VIII does not allow appellants to use rigid quotas of indefinite duration to maintain a fixed level of integration ..."
*Id.,* p. 1103.

---

**8.** *U.S. v. Starrett City Assocs.,* 840 F.2d 1096 (2nd Cir.1988), *cert. denied* —— U.S. ——, 109 S.Ct. 376, 102 L.Ed.2d 365 (1988), does not require an opposite holding. The majority opinion said:
"We do not intend to imply that race is always an inappropriate consideration under title

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey any real and personal property."

42 U.S.C. § 1982. "[I]n sharp contrast to" the Fair Housing Act, "42 USC § 1982 is not a comprehensive open housing law," *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968), but is "limited on its face to discrimination with respect to property rights." *Krieger v. Republic Van Lines*, 435 F.Supp. 335, 338 (S.C.Tex.1977), citing *Jones.*

Moreover, the property right at issue in a Section 1982 claim must (except in extraordinary circumstances not present in the instant case) be the plaintiff's *own* property right. *Mackey v. Nationwide Ins. Companies*, 724 F.2d 419, 421–22 (4th Cir.1984); *Wilkey v. Pyramid Const. Co.*, 619 F.Supp. 1453, 1455–57 (D.C.Conn.1985).

In addition, "an essential element" of a Section 1982 claim is a showing of "intentional racial discrimination," *Phillips v. Hunter Trails Comm. Assn., supra*, 685 F.2d at 187, seemingly more stringent than the "intent" showing required under the Fair Housing Act. *See, Jones v. Alfred H. Mayer Co., supra*, 392 U.S. at 421–22, 88 S.Ct. at 2193–94 (indicating that a showing of racial animus is required under Section 1982.)

15. The NAR and the GSSBR have failed to establish these "essential elements" of a Section 1982 claim. First, there was no evidence establishing that any person's property rights have been infringed by the SSHC's activities. *See, Steptoe, supra* at 1322–23 (housing center "in no way could have impaired … property interests" because homeseekers could obtain any "necessary housing information from traditional commercial channels.")

Second, the NAR and the GSSBR have failed to assert or prove that their *own* property rights have been infringed by the SSHC. No right of the NAR or the GSSBR to purchase, sell or lease property has been referred to.

Finally, there is no evidence in the record that the SSHC engaged in "intentional racial discrimination" of the type deemed essential in *Jones.*

Accordingly, the court concludes counterplaintiffs have failed to establish their Section 1982 claim.

### d. *Section 1983 Claim*

16. Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

42 U.S.C. § 1983. In order to prevail in a Section 1983 claim against the SSHC, counterplaintiffs must show that acting "under color of" state law the SSHC deprived them of rights secured by the Constitution or federal law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970).

17. In order to establish a violation of Section 1983 counterplaintiffs must also establish that the challenged conduct deprived counterplaintiffs of a right secured by the Constitution or laws of the United States. Counterplaintiffs have not proved that the SSHC deprived any person of statutory rights. Thus it remains only to consider the possibility of a deprivation of a constitutional right.

18. The only constitutional claim apparently raised in Counts I and II of the counterclaim is an equal protection claim. Counterplaintiffs allege that counterdefendants' programs "have the purpose and effect of restricting access to housing, with minority home buyers and renters shouldering most of the burden." (Counterclaim, ¶ 22)

19. Counterplaintiffs clearly have no standing to assert this claim. An equal protection claim would clearly rest on legal

rights of minority homebuyers rather than those of homesellers. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205; *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608. In addition, counterdefendants' programs do not restrict access to housing on account of race. (Conclusions of Law, No. 7, *supra,* p. 1087).

20. The court concludes that counterplaintiffs have failed to establish their Section 1983 claim.

## FINDINGS OF FACT

### COUNT III

### "For Sale" Signs

1. Hazel Crest bans the use of real estate "for sale" signs. This ban was enacted as a result of expressions of concern from residents about the community. (Tr. 6412–21)

2. University Park repealed its sign ban after trial commenced, replacing the ban with an ordinance that allows one "for sale" sign in a home's window. (DX326, § 1272.07(a)(2); DX472) Its declared purpose is "to protect the aesthetically pleasing qualities of the village as a wooded, suburban-rural, and visually open area" and to apply the non-illuminated real estate signs in a residential district that serves as a similar standard as that applicable to political signs. (DX472)

3. Glenwood repealed its sign ban on the eve of trial, replacing it with an ordinance that permits the imposition of limited bans only in specified circumstances. (MX190; DX133; Tr.3319–22)

4. Country Club Hills restricts the use of "for sale" signs in two different ways: first, by regulating the placement and size of these signs, and second, by imposing a fee and permit requirement that applies only to "for sale" signs. (MX11; MX598) In addition, the city has a voluntary sign restraint program designed to "stop some of the [homeseeking] traffic that we have on ride throughs." (DX479, p. 6; *see* ¶¶ 179–80, *infra*) The declared purpose was "to preserve the proper character of

the residential zoning district" and "to regulate the intrusion of commercial signage within residential zoning."

5. Country Club Hills restricts the use of real estate signs to the placement of one sign no larger than three square feet from the house on each property. (MX11) In addition, the city's regulations require that the sign be placed parallel to the front of the house. *Id.*

6. Matteson and Park Forest also regulate the use of "for sale" signs differently from other signs. (DX282; DX290) In Matteson residential real estate signs are limited to a size of eight square feet and five feet in height. In addition, there can only be one such sign on each lot and it must be within fifteen feet of the building. (DX290, p. 112) Its purposes include protecting aesthetic values and ensuring compatibility with the environment. (DX290) In Park Forest real estate signs are limited to one sign of five square feet or less, including the frame or post, per lot. (DX282, pp. 2–4) Its declared purpose is "to facilitate an easy and pleasant communication between people and their environment by the use of signs which are consistent and harmonious with their environment and the concept of this village as primarily a residential planned community." (Park Forest Code, §§ 31–145)

7. "For sale" signs are a cost effective and valuable form of advertising which benefits homesellers, who get exposure for little cost; homeseekers, for whom signs may be a direct source of information about the availability of homes; and brokers, for whom signs provide a source of sales and a measure of good will advertising. (Tr.2507–58; 2612–13; 3822–23)

8. Assuming that a sign ban, as opposed to regulations might ever be valid, the court finds that Hazel Crest did not meet the extremely difficult burden of proving imminent threat of "sudden and wrenching change" in the community, substantial panic selling; that such a ban would be necessary or effective.

9. The court found little evidence that the sign regulations resulted in measurable lost income for realtors, that the regula-

tions had a discriminatory impact on black homeseekers, or that they denied access to housing to anyone. Therefore the court finds the sign regulations, as opposed to the outright ban of Hazel Crest, are modest and reasonable.

10. A proliferation of "for sale" signs is widely perceived to be destablizing to an integrated community. (Tr.6942–46) The court therefore finds it reasonable for a municipality to minimize the appearances of "for sale" sign proliferation so that the community has an opportunity to present the counter message that panic avoidances can lead to a stable integrated community.

### CONCLUSIONS OF LAW

#### a. *Fair Housing Act*

■ 1. Counterplaintiffs' Fair Housing Act challenge to "for sale" sign ordinances (Count III) fails. Hazel Crest prohibits the use of residential "for sale" signs. Country Club Hills, Matteson, Park Forest and University Park merely regulate the time, place and manner of their use.

2. Counterplaintiffs failed to make any credible showing that the "for sale" sign ordinances made housing unavailable to any person because of race and their Fair Housing Act claim fails on that basis alone. Nor did counterplaintiffs establish that the municipalities enacted or administered these ordinances with discriminatory intent. The purposes underlying the Hazel Crest ordinance—the promotion of a stable, racially integrated community—and the purpose of the sign regulations of the other challenged counterdefendants—community aesthetics—clearly are not discriminatory. All of these ordinances are racially neutral and counterplaintiffs adduced no substantial evidence that the stated purposes of the legislation were in any way contrived or pretextual. Nor did counterplaintiffs make a sufficient showing of discriminatory effect or disparate impact under the *Arlington Heights II* standard. 558 F.2d at 1290–93.

3. *First Factor.* Counterplaintiffs failed to demonstrate that the "for sale" sign ban or size and placement ordinances have a racially discriminatory effect or a disparate impact. Very few homeseekers of any race find the house they eventually purchase by viewing "for sale" signs and the evidence suggests that black homeseekers rely overwhelmingly on real estate agents, rather than signs, to locate properties. Counterplaintiffs have not shown that the effect of the "for sale" sign ordinances is to perpetuate segregation—the other cognizable discriminatory effect recognized in *Arlington Heights II,* 558 F.2d at 1290.

4. *Second factor.* As discussed above, no showing of discriminatory intent has been made with respect to the "for sale" sign ordinances. This element of the *Arlington Heights II* test therefore also weighs against a finding of liability.

5. *Third Factor.* The interest of Hazel Crest in enacting its "for sale" sign ordinance—the promotion of stable, racially integrated neighborhoods—has long been recognized as a significant and legitimate governmental interest. *See,* e.g., *Trafficante,* 409 U.S. at 211, 93 S.Ct. at 367; *Gladstone,* 441 U.S. at 111, 99 S.Ct. at 1613. Nor can there be any question that the interest in community aesthetics of four municipal counterdefendants is also a substantial and legitimate governmental purpose. *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 507–08, 101 S.Ct. 2882, 2892–93, 69 L.Ed.2d 800 (1981) (White, J., plurality).

Accordingly, this factor also cuts against any Fair Housing Act liability.

6. Counterplaintiffs have therefore failed to establish their Fair Housing Act challenge to the "for sale" sign ordinances.

#### b. *Constitutional Challenge*

7. Count III of the counterclaim challenges the "for sale" sign bans and ordinances of the municipal counterdefendants as violative of the First Amendment and Article I, Section 4 of the Illinois Constitution. The issue is limited here; only Hazel Crest bans the use of residential "for sale" signs. (MX101) However Country Club Hills, Matteson, Park Forest and University Park regulate the size, placement and

number of such signs and counterplaintiffs have challenged those regulations too.

■ 8. The Supreme Court has already struck down a sign ban virtually identical to that of Hazel Crest. In *Linmark Assocs., Inc. v. Willingboro,* 431 U.S. 85, 87–88, 97 S.Ct. 1614, 1615–16, 52 L.Ed.2d 155 (1977), an unanimous Supreme Court held that a municipal ordinance banning "for sale" signs violated the First Amendment.

9. The circumstances in *Linmark* were strikingly similar to the facts here. Willingboro was a predominantly white community throughout its early history. By 1970 it had achieved some measure of integration, with a black population of approximately 11.7 percent. By 1973 the black population had risen to 18.2 percent, and Willingboro sought to control the racial change that appeared to be taking place. One of the township's chosen methods was a "for sale" sign ban. *Id.* at 87–88, 97 S.Ct. at 1615–16.

10. Accepting Hazel Crest's contention that a sign ban might be legal under certain rare circumstances, the evidence falls short of demonstrating that the ban is necessary to assure that Hazel Crest remains an integrated community. *Linmark,* 431 U.S. at 95, 97 S.Ct. at 1619. (*See,* Findings of Fact No. 8, *supra,* p. 1090) First, Hazel Crest has offered no evidence that substantial "panic selling" was occurring in the community at all, much less as a result of "for sale" signs. *Id.* In *Linmark,* by contrast, various witnesses testified that real estate signs were a major cause of the "panic selling" that was occurring. *Id.* at 87–88, 97 S.Ct. at 1615–16.

11. Second, Hazel Crest made no showing that the sign ban reduced public awareness of home sales and thereby decreased public concern. *Id.* at 96, 97 S.Ct. at 1620. In *Linmark* the court noted that the sales volume was unchanged after the ban was enacted and concluded that the ban had little impact on the public's concerns. Indeed the court suggested that a ban might actually "fuel public anxiety by increasing homeowners' dependence on rumor and surmise." *Id.* at 96 n. 10, 97 S.Ct. at 1620 n. 10.

12. Third, Hazel Crest has not demonstrated that an emergency existed in the community that precluded dispelling public concern over any asserted panic selling through education and the dissemination of additional information. *See, City of Chicago v. Prus,* 117 Ill.App.3d 455, 72 Ill.Dec. 901, 916, 453 N.E.2d 776, 791 (1983). In fact Hazel Crest admits that no areas of the village have ever undergone rapid racial change, contending only that such turnover *could* develop in the future. Such evidence is plainly insufficient to uphold a sign ban. *See, Linmark,* 431 U.S. at 85, 97 S.Ct. at 1615 ("only an emergency can justify repression"); *Prus,* 72 Ill.Dec. at 916, 453 N.E.2d at 791 (necessary to show a "sudden, wrenching change.")

13. Accordingly, the Hazel Crest sign ban violates the First Amendment. Moreover, since the free speech protections of the Illinois Constitution are even broader than those afforded by the United States Constitution, Hazel Crest's ordinance also violates Article I, Section 4 of the Illinois Constitution. *See, Blue Island v. Kozul,* 379 Ill. 511, 41 N.E.2d 515, 520 (1942).

■ 14. The First Amendment tolerates reasonable time, place or manner restrictions of speech such as those of Country Club Hills, Matteson, Park Forest and University Park. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984). Such restrictions are valid "provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.* at 294, 104 S.Ct. at 3069.

15. The "for sale" sign size, placement and manner restrictions contained in the ordinances of Country Club Hills, Matteson, Park Forest and University Park merely regulate but do not prohibit signs. Consequently the time, place and manner standard of *Clark* and therefore the First Amendment is not violated.

16. The "for sale" sign regulations of Country Club Hills, Matteson, Park Forest and University Park also pass the *Clark* constitutional test because they are justified without reference to the content of the regulated speech, they are narrowly tailored to serve a significant governmental interest and they leave open ample alternative channels for communication of the information. *Clark*, 468 U.S. at 294, 104 S.Ct. at 3069.

## FINDINGS OF FACT

## COUNT IV

### Anti–Solicitation Ordinances

1. The municipalities also employ anti-solicitation ordinances in their integration maintenance programs. (MX2; MX4; MX101–02; MX187–88; MX271; MX248; MX382) The ordinances of Country Club Hills, Glenwood, Hazel Crest and Matteson are virtually identical and provide:

"No real estate agent shall solicit any owner or occupant of a dwelling *to sell or rent, or list for sale or rental*, such dwelling at any time after such owner or occupant has notified the [Municipality] that he does not desire to be so solicited.

\* \* \* \* \* \*

"The [Municipality] shall prepare a list of names and addresses of such owners and occupants and shall publish the same as follows:

\* \* \* \* \* \*

(B) By mailing or otherwise delivering a copy of said list annually, to every real estate firm belonging to the local board of realtors ..."

2. These ordinances define "solicit" or "solicitation" as:

"[A]ny communication by or on behalf of a real estate agent with the owner or occupant of a dwelling (i) which is *intended to induce* the sale, rental or listing for sale or rental of such dwelling; (ii) which is intended to offer or promote services in connection with the sale, rental or listing of such dwelling; and (iii) which is carried out by means of:

(a) in-person contacts at the dwelling;

(b) written material mailed or delivered directly to the dwelling, such as direct mail, leaflets or pamphlets; or

(c) telephonic contacts with owners or occupants of the dwelling.

"For purposes of this Ordinance the term "solicit" or "solicitation" shall not refer to communication carried out by means of print or electronic media of general circulation, such as newspaper, radio, television or the yellow pages."

3. Park Forest defines solicitation as "any conduct (excluding advertisements in newspapers, magazines or broadcast media of general circulation) designed or intended to induce the owner of real property ... to sell, rent, exchange, convey, transfer or list for sale or rental such real property." (MX832, § 24–½–1)

4. Violations of the anti-solicitation ordinances in each of the municipalities except Park Forest are punishable by fines of up to $500. (MX4, § 19.11.01; MX187, §§ 29–39; MX101, §§ 14–57; MX271, § 32.124) Park Forest leaves the nature of its penalty to the discretion of its Village Board. (MX382, § 24–½–25(k))

5. Indeed *counterdefendants'* witnesses testified that the anti-solicitation ordinances are based on the desire to protect residents from exposure to advertising because this information might cause homeowners to question the racial stability of their communities or re-evaluate their decisions to live there. (Tr.3059; 5255; 6133–35; 6398; 7001) As with "for sale" sign bans, the ordinances are designed to keep residents from moving, to maintain the status quo and to reduce the ability of homeseekers to find homes in the municipalities. (Tr.2082–83; 4459–61)

6. Nevertheless each municipality chose to arrange the list alphabetically by the surnames of residents—not by street name. (DX195; DX449A; Tr. 3079–80; 6634–35) Compiling the lists in this fashion makes it more difficult for real estate brokers to use directories that are arranged by street name which is a common *modus operandi*. (DX195, p. 2) Hazel Crest refused a specific

request that its list be arranged alphabetically by street address. (Tr. 3747–51)

7. The municipalities' arrangement of the list increased the cost and burden of compliance with the anti-solicitation ordinances and exacerbated the risk of inadvertent violation. (Tr. 3083–85; 4740–42) Because of these risks some brokers have chosen not to solicit, prospect, or farm in anti-solicitation villages. (Tr. 2601–08; 4728–29; 4734–35; 58782–73)

8. Although it is somewhat more costly to arrange solicitation lists by street, this burden is not sufficient to justify the added burden to the realtors resulting by the failure to do so. (Tr. 3083–85, 4740–42) It appears however that all lists are now organized by street name as a result of pressure of the realtors. (Tr.3079–80; 5789–90; 6401–02; 6405; MX24; MX153; MX199; MX284) [9]

9. In response to the instant case, and the suits challenging Hazel Crest and Matteson's ordiances (Tr. 3809–10), the municipalities acted on the advice of their trial counsel and amended the definition of solicitation contained in their ordinances.[10] (Tr. 3170–73; 5388–90; 5598–5600; 6640–42; DX199; DX222–23; DX267) According to the municipalities this amendment did not cause any substantive change in the definition of solicitation other than to expressly exempt advertisements in general circulation media. (Tr. 6639–40)

10. Widespread solicitation by real estate brokers and salesmen, similar to the "for sale" sign proliferation, is widely perceived to be destablizing to an integrated community. (Tr. 6930–33) The anti-solicitation ordinances are designed to make solicitation more difficult and expensive.

11. Another purpose of the anti-solicitation ordinances is to provide a method for a resident to obtain a measure of privacy by avoiding annoying and intrusive inquiries about residential plans.

12. Matteson, Glenwood and Hazel Crest actively publicize the fact that they have an anti-solicitation ordinance; Country Club Hills and Park Forest do not. The result is that the antisolicitation lists of the former are larger than those of the latter. (DX136; DX196; DX201; DX205–06; DX226; DX264; DX272; DX275; MX421)

13. The effect of the anti-solicitation ordinances is greatly exacerbated by the uncertainty of the meaning of the term "solicitation." The counterdefendant municipalities interpret their ordinances to ban all business communication mailed or delivered by real estate brokers, even if their intended purpose was only to generate goodwill, such as holiday calendars, birthday greetings, the sales of investment or vacation property, or to find buyers or referrals.

## CONCLUSIONS OF LAW

### a. *Fair Housing Act Challenge*

 1. The solicitation ordinances are not racially discriminatory, either in intent or in effect. First, the record is devoid of substantial evidence tending to show that the ordinances were intended to discriminate against blacks or any other racial group.

2. Similarly, there is no substantial evidence tending to show that the solicitation ordinances have had a racially discriminatory effect. The purpose of the ordinance is to bar from solicitation only those who request it. Therefore the only families barred from receiving solicitations are precisely those who are least likely to offer their homes for sale anyway—families (black and white, newcomers and oldcomers) who have affirmatively indicated that they are not interested in moving or selling or listing their homes and do not want to be bothered by real estate salesmen looking for business. The solicitation ordi-

---

**9.** Counterplaintiffs have failed a motion to reopen and supplement the record to show, *inter alia,* that Country Club Hills has jumbled its 1988 anti-solicitation list. It appears from the response that the list has now been unjumbled. Therefore the motion is denied.

**10.** Park Forest did not have the same type of anti-solicitation ordinance as the other municipalities until November 25, 1985. When it enacted its ordinance a definition substantially similar to the one contained in the amendments was included.

nances are facially neutral and nondiscriminatory as to race and the evidence failed to establish that they are otherwise with regard to effect or result.

3. The foregoing conclusions are buttressed by an application of the *Arlington Heights II* test, 558 F.2d at 1290–93.

4. *First Factor.* Under either of the two species of discriminatory effect set forth in *Arlington Heights II*—disparate impact or furthering segregation—the showing of discriminatory effect here was nonexistent or extremely weak. As indicated above, there was no substantial showing that the solicitation ordinances have a disparate impact on blacks and, by the nature of such ordinances, such an impact is very unlikely.

5. *Second Factor.* Because the court finds that there is no evidence of discriminatory intent with regard to the solicitation ordinance, the second criterion of *Arlington Heights II* also cuts against any finding of liability.

6. *Third Factor.* The interests of counterdefendants in taking the limiting solicitation heavily weighs against a finding of liability. First, it is beyond doubt that the privacy and promotion of racial diversity purposes underlying the solicitation ordinances are significant and legitimate governmental interests. Furthermore, if "the defendant is a governmental body acting within the ambit of legitimately derived authority," it is "entitled to the deference which courts must pay to legitimate governmental action" and the courts "will less readily find that [the] action violates the Fair Housing Act." *Arlington Heights II*, 558 F.2d at 1293. Here the municipal counterdefendants acted within their legitimately derived authority. There was no issue at trial as to the communities' right, pursuant to home rule authority or otherwise, to enact the solicitation ordinances. The claim has been that those ordinances violate federal law, not that they exceeded the lawmaking powers of Illinois municipalities. Thus the solicitation ordinances and the other municipal enactments in this case deserve the deference of the court.

b. *First Amendment Challenge*

7. The communications sought to be prohibited by counter-defendants' anti-solicitation ordinances constitute commercial speech and they are entitled to "qualified" but nevertheless "substantial" protection by the First Amendment. *Bolger v. Youngs Drug Prdts. Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 2881, 77 L.Ed.2d 469 (1983).

*Central Hudson Gas & Electric Corp. v. Public Service*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), established a four-part analysis for assessing the validity on commercial speech.

1) Whether the expression is constitutionally protected;

2) Whether the government interest is substantial;

3) Whether the regulation advances the government interest asserted; and

4) Whether it is more extensive than necessary to serve that interest.

8. Under the *Central Hudson* analysis, the anti-solicitation ordinances are unconstitutional as applied to some of counter-defendants' mailings.

The ordinances apply to virtually all mailings of Realtors without regard to being false, deceptive or misleading. Although the government has an interest in protecting the privacy of its citizens who desire such protection and although the government has an interest in promoting the appearance of racial stability and avoiding fears of blockbusting and racial unrest, and preventing mailings from Realtors certainly advances these interests, nevertheless the effect of banning all communication by mail from Realtors is far more extensive than necessary.

The effect of the ordinances as interpreted and enforced by counterdefendants is to prohibit the mailing of mere promotional material from Realtors. The interests claimed by counter-defendants clearly could be met by a much less restrictive ordinance: the banning of solicitations actually seeking to induce the sale, rental or listing of a dwelling would be sufficient to meet the proferred needs of counterdefendants. It is hard to see how communicat-

ing the existence of a particular Realtor to a citizen of a community can be detrimental to racial stability of a community.

*Frisby v. Schultz,* —— U.S. ——, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), does not compel a different result. In *Frisby* the Supreme Court upheld an ordinance that barred picketing focused on a single home. In so doing the court focused on the fact that the picketing ban was narrowly tailored to protect the home occupier from a form of message that was particularly "offensive and disturbing." The vice in the ordinances of counterdefendants is that it bans virtually all communications from realtors regardless of content in order to save residents from receiving solicitations to buy their homes. It is not narrowly tailored to effect this purpose because it bans communications, innocent as well as offensive.

■■■ 9. The ordinances also fail to satisfy due process. The ordinances must be sufficiently explicit to inform those who are subject to them of what conduct is prohibited. *See, Bouie v. Columbia,* 378 U.S. 347, 352, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964); *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). This vagueness test is particularly stringent in cases where as here the laws in question impinge on constitutionally protected conduct. *Hynes v. Mayor of Oradell,* 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976).

10. The ordinances define solicitation as any communication "intended to induce the sale, rental or listing" of a dwelling. This definition could be interpreted (and is by counter-defendants) to include virtually anything, such as an exchange of business cards, a friendly chat while showing homes in a neighborhood, introducing new neighbors, or the announcement of the opening of a new office. Therefore the ordinances are unconstitutionally vague on their face. *See, Illinois Ass'n of Realtors v. Village of Bellwood,* 516 F.Supp. 1067, 1075 (N.D.Ill. 1981).

11. A substantial question exists as to whether the ordinances cover "indirect" solicitations. The trial testimony showed that by lumping "solicitation" with "advertisement" the municipalities rendered the definition of solicitation hopelessly vague. *See, Coldwell Banker Res. Real Estate v. Clayton,* 105 Ill.2d 389, 86 Ill.Dec. 322, 325, 475 N.E.2d 536, 539 (1985) (statutes should be given their "plain and ordinary meaning.") "Solicitation" means to move to action, to endeavor to obtain by urgent request and implies personal petition to a particular person to do a particular thing (Webster's New Collegiate Dictionary 106 (4th Ed.1977); Black's Law Dictionary 1248–49 (5th Ed.1979), while "advertising" is the calling of information to the attention of the public by whatever means (Webster's at 18; Black's at 50).

12. Just before trial the municipalities distributed a letter stating that they believe *every* "business communication" from a real estate broker is a solicitation to list or sell—despite the ordinances' requirement that a communication must be *intended to induce a sale or listing for sale.* The text of the ordinances provide insufficient warning that "indirect" solicitation is prohibited and thus they are unconstitutionally vague.

## FINDINGS OF FACT

## COUNT V

### Data Reporting

■■■ 1. At the time the NAR and the Board filed their counterclaim in this action, Matteson and Glenwood each had ordinances requiring real estate brokers to report to the villages, *inter alia,* the name, address, telephone number and race of all prospects to whom they had shown properties, the locations of the homes shown to those individuals, the location of homes the prospects offered to purchase, and the address of the home if they ultimately bought. (MX187, Art. V; MX271, Art. V) Each of these ordinances was based on a prototype prepared by the BPI for all of the FHLAC communities. (Tr. 3388–89; DX307)

2. None of the other municipalities has ever enacted a data collection ordinance

mandating that brokers provide this information. (Tr. 5162; 6701). To the extent these other villages collect housing data they do so by means of voluntary entrance interview questionnaires distributed to new residents when they sign up for water service. (Tr. 5023–25; 6237–30; 6511)

3. Shortly before trial began both Glenwood and Matteson amended their data collection ordinances on advice of counsel. (MX189; MX275; MX277; DX105) The amendments provided that real estate brokers could omit the names, addresses and phone numbers of their prospects from their reports to the village if they agreed to maintain that data and make it available upon request. Brokers thereafter had the option to provide data only about the race of homeseekers and properties shown in their monthly reports. (MX189, § 11-1/2-50(d); MX277; § 32.01(C))

## CONCLUSIONS OF LAW

### COUNT V

#### a. *Fair Housing Challenge*

1. Although Count V is directed against all the municipal counterdefendants, only Glenwood and Matteson have data reporting ordinances. (MX189, 277) Consequently Count V applies only to those two counterdefendants.

2. Counterplaintiffs claim that the data reporting ordinances of Glenwood and Matteson violate the Fair Housing Act. However there was no evidence that those ordinances ever made housing unavailable to any person on account of race. For that reason alone counterplaintiffs have failed to establish a Fair Housing Act violation.

3. The data collection ordinances require the reporting of homeseeking data for both black and white homeseekers. The information is carefully safeguarded, proper use is defined and the ordinances provide for quasi-criminal penalties for a violation of confidentiality or misuse of the information. No discriminatory purpose or intent underlies these ordinances. In fact they provide information which contributes to the identification of discriminatory real estate practices so that proper action may

be taken. Counterplaintiffs failed to show a single instance when the information was used for any other purpose or was in any way misused. Racial housing information is gathered routinely by other organizations for legitimate purposes. It is a regular part of the United States Census data and the NAR (as part of its VAMA) strongly urges local boards and Realtors to collect and maintain data on the race of homeseekers served. Counterplaintiffs did not establish discriminatory intent, *Phillips*, 685 F.2d at 190, or prove that these ordinances had a discriminatory effect or disparate impact on minorities. *Arlington Heights II*, 558 F.2d 1293–94. Therefore their Fair Housing claim fails.

#### b. *Constitutional Challenge*

4. Counterplaintiffs assert in Count V that the data reporting ordinances of the municipal counterdefendants stigmatize racial minorities and violate their right to privacy. They also contend that these ordinances violate counterplaintiffs' and their members' right to equal protection and due process and chill their right to free speech. At trial counterplaintiffs failed to substantiate any of these purported effects to third parties, themselves or their members.

Accordingly, the constitutional challenges against the data reporting ordinances fall.

5. The claim of stigmatic injury would fail because the data reporting ordinances are race-neutral and counterplaintiffs have failed to introduce any evidence of discriminatory intent underlying those provisions. *Arlington Heights I*, 429 U.S. at 266, 97 S.Ct. at 564.

6. Counterplaintiffs' assertion that the data reporting ordinances violate minorities' right to privacy is also without merit. First, no one at trial contended that the governmental collection of racial data in and of itself is an invasion of privacy or otherwise wrongful conduct. The Census Bureau as well as the Realtors themselves collect racial data. Courts routinely approve of the collection and reporting of racial data. *See*, e.g., *Caulfield v. Bd. of Ed.*, 583 F.2d 605, 611–12 (2nd Cir.1978)

(Constitution does not condemn the collection of racial data); *U.S. v. New Hampshire,* 539 F.2d 277, 280–82 (1st Cir.1976), *cert. denied* 429 U.S. 1023, 97 S.Ct. 641, 50 L.Ed.2d 625 (1976) (requirement that state provide racial and ethnic data to federal government is constitutional); *Safeway Stores, Inc. v. NLRB,* 691 F.2d 953, 957 (10th Cir.1982); *Cf. Whalen v. Roe,* 429 U.S. 589, 605–06, 97 S.Ct. 869, 879–80, 51 L.Ed.2d 64 (1977) (collection and maintenance of data regarding the names and addresses of persons who obtained certain prescription drugs not an invasion of privacy.) The issue rather is the use to which the data is put and the precautions taken to ensure confidentiality.

7. There was no credible evidence at trial that the purposes for which the data are used are improper. Indeed, the evidence was to the contrary, for even as counterplaintiffs' own witness acknowledged, the collection of data to identify discriminatory housing practices and to dispel harmful rumors is useful and proper.

8. Furthermore, the confidentiality precautions undertaken by Glenwood and Matteson prevent any privacy breach against the rights of blacks or anyone else. The ordinances mandate strict confidentiality in the use of the data, precisely define and limit access to the information, and impose substantial penalties for violations. (MX189, § 11–1/2–53; 277, § 32.105) Glenwood and Matteson village officials review and analyze the data only in its aggregate form. Besides, the reporting of the identity of homeseekers is not required at all so the opportunities for misuse of information are minimized. The ordinances are carefully structured to ensure that invasions of privacy do not occur; and there was no evidence at trial that any ever have. *See, Whalen,* 429 U.S. at 601, 97 S.Ct. at 877 (no violation to right to privacy where security provisions prevent improper disclosure and access to private data.)

9. As to counterplaintiffs, the data collection ordinances are a type of economic regulation and their equal protection and due process claims, accordingly, are subject to the minimum scrutiny rational basis test. *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 82–84, 98 S.Ct. 2620, 2635–36, 57 L.Ed.2d 595 (1978) (rationality test of state economic regulation applies equally to substantive due process and equal protection claims); *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124–25, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91, *reh'g denied* 439 U.S. 884, 99 S.Ct. 232, 233, 58 L.Ed.2d 200 (1978). Under that standard "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is reasonably related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

10. The municipalities' interests in data collection—identifying discriminatory practices and dispelling unfounded rumors—clearly are legitimate governmental purposes. Obtaining homeseeker information from Realtors enables the municipalities to monitor compliance with their fair housing ordinances and surely is rationally related to the foregoing purposes. Furthermore, counterplaintiffs failed to offer any credible evidence that these ordinances present any burden to their members, not to mention an unreasonable one. Counterplaintiffs' equal protection and due process challenges therefore fail.

11. Finally, the claim that the data reporting ordinances chill the free speech of counterplaintiffs and their members is unavailing. There was no evidence whatsoever that the data reporting ordinances in any way chilled or even affected counterplaintiffs' or their members' rights to free speech.

## FINDINGS OF FACT

### COUNT VI

### Treatment of Governmental and Non–Profit Activities

1. In Count VI, counterplaintiffs allege that the municipalities permit governments and not-for-profit organizations to engage in discriminatory activities by excluding these entities from the scope of the Model

Ordinances and by proscribing certain real estate practices only if they are performed for profit. (Counterclaim, ¶¶ 79–80) As the court finds below, there is no evidence to suggest a discriminatory purpose or effect as a result of these provisions.

2. The rationale and specific explanation for the challenged provisions is included in the BPI commentary provided to each municipality enacting the Model Ordinance. (*See*, e.g., MX267 at 4–8, 12–13) The "special outreach" proviso is based upon and specifically authorized by the Illinois Human Rights Act and the Illinois Municipal Code, Ill.Rev.Stat., ch. 68, § 7–108(D); ch. 24, ¶ 11–11.1–1 (1985), and is consistent with HUD regulations and practices. (*See*, MX267 at 4–8) Special outreach must be "by or under the authority of" units or local government or non-profit fair housing agencies to ensure that any such efforts by real estate firms are conducted in compliance with federal, state and local fair housing laws. *Id.*

3. Counterplaintiffs' challenge is apparently directed at two provisions of the fair housing ordinances based upon the Model Ordinance. The first is the provision that exempts from the definition of discrimination:

"Special outreach efforts conducted by or under the authority of units of local government ... or non-profit fair housing agencies to ensure that persons of minority groups are fully informed of available dwelling opportunities in areas of present or prospective majority group concentration, or to ensure that persons of the majority group are fully informed of available dwelling opportunities in areas of present or prospective minority group concentration."

(MX4, § 19.2.01; MX101, §§ 14–27; MX187, § 28–4; MX271, § 32.83) The second provision makes it a prohibited act to:

"For profit, induce or attempt to induce the sale, rental or listing for sale or rental of any dwelling by representations regarding the presence in, proximity to, or entry or prospective entry into, the block, neighborhood or area of a person

or persons of a particular race, color, religion, sex, or national origin."

(MX4, § 19.4.01(H); MX101, § 14–29(H); MX187, § 18–13; MX271, § 32.92)

4. The "for profit" panic peddling prohibition is derived from and parallels the Fair Housing Act itself. *Id.* at 10–14.

5. In essence, the court finds that the municipalities have enacted the challenged special outreach and panic peddling provisions for the purpose of following analogous state and federal statutes and not for any invidious or discriminatory purpose. Furthermore, the court finds no evidence to suggest that non-profit agencies, like the SSHC, or the municipalities have engaged in panic peddling or any other discriminatory conduct allegedly permitted by the wording of the challenged provisions. Accordingly, the court finds no factual basis to support this last claim of counterplaintiffs.

## CONCLUSIONS OF LAW

### COUNT VI

*A. Fair Housing Preemption Claim*

1. Section 3615 of the Fair Housing Act provides that "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." 42 U.S.C. § 3615. Counterplaintiffs contend that municipal counterdefendants' fair housing ordinances violate that provision because they permit steering or other race-conscious activity when performed by government or not-for-profit entities and therefore they are preempted. (Count VI)

2. However state or local legislation will be preempted only if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). The preeminence of federal law will be determined from the dominance of the federal interest as stated in the Constitution, *id.* at 62, 61 S.Ct. at 401, or if the regulation is "intertwined with the respon-

sibilities of the national government," *id.* at 66, 61 S.Ct. at 403. The mere fact that Congress has legislated in a particular field "cannot mean ... that every federal statute ousts all related state law." *Hillsborough Cty. v. Automated Medical Labs., Inc.,* 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985). Counterplaintiffs have failed to introduce evidence which satisfies either branch of the *Hines* doctrine. Absent such a showing counterdefendants' outreach efforts cannot be considered an obstacle to the goals of the Fair Housing Act; consequently the ordinances are not preempted.

■ 3. Special outreach efforts which further and promote racial integration and diversity are not now and never have been a "discriminatory housing practice" under the Fair Housing Act. Indeed, the promotion of integrated housing and neighborhoods is one of the primary goals of the Act; *Trafficante,* 409 U.S. at 211, 93 S.Ct. at 367; *Gladstone,* 441 U.S. at 111, 99 S.Ct. at 1613; *Arlington Heights II,* 558 F.2d at 1289; *Barrick Realty, Inc. v. City of Gary, Ind.,* 491 F.2d 161, 164–65 (7th Cir. 1974).

■ 4. Nor is the prohibition of panic peddling "for profit" in the Model Ordinances adopted by Country Club Hills, Hazel Crest and Matteson offensive to the Fair Housing Act. Indeed, the Model Ordinances parallel the language of Section 3604(e) of the Fair Housing Act by stating:

"PROHIBITED ACTS

Panic Peddling.

For profit, induce or attempt to induce the sale, rental or listing for sale or rental of any dwelling by representations regarding the presence in, proximity to, or entry or prospective entry into, the block, neighborhood or area of a person or persons of a particular race, color, religion, sex, or national origin."

(MX271, § 39.92)

5. The Fair Housing Act acknowledges that certain conduct, such as panic peddling, is indigenous to, and particularly egregious in, a commercial setting. *See, U.S. v. Bob Lawrence Realty, Inc.,* 474 F.2d 115, 122 (5th Cir.), *cert. denied* 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973) (" '[The words "for profit"] ... were evidently included in § 3604(e) to distinguish and eliminate from the operation of that subsection statements made in social, political or other contexts, as distinguished from a commercial context, where the person making the representations hopes to obtain some financial gain as a result of the representations.' ") (quoting *U.S. v. Mintzes,* 304 F.Supp. 1305, 1312 (D.Md.1969)).

b. *Constitutional Challenge*

■ 6. Counterplaintiffs contend that their rights to equal protection are violated by the distinction in the Model Ordinance communities' fair housing ordinances which permit governmental bodies and non-profit housing centers to engage in special outreach efforts, while such conduct is not permitted for the counterplaintiffs. This distinction does not violate counterplaintiffs' right to equal protection.

■ 7. The standard of review for counterplaintiffs' equal protection claim is the rational basis test. That standard uniformly is applied in cases such as this one involving attacks on social or economic legislation. *See,* e.g., *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254; *U.S. RR Retirement Bd. v. Fritz,* 449 U.S. 166, 174–77, 101 S.Ct. 453, 459–61, 66 L.Ed.2d 368 (1980), *reh'g denied* 450 U.S. 960, 101 S.Ct. 1421, 67 L.Ed.2d 385 (1981); *Vaden v. Village of Maywood,* 809 F.2d 361, 365 (7th Cir.1987). A higher level of scrutiny occurs only upon the implication of a fundamental right or the use of a suspect classification. *Fritz,* 449 U.S. at 174, 101 S.Ct. at 459; *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. Real estate agents are not a suspect class nor does the classification challenged here offend any recognized fundamental right.

8. Under the rational basis test, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. In applying this standard the court considers neither the improvidence of the legislation nor whether its

goals could be accomplished more effectively. *Id.; Vaden,* 809 F.2d at 365. Rather, in the inquiry simply is "whether the ordinance is wholly arbitrary." *Vaden,* 809 F.2d at 365; *see,* also, *Fritz,* 449 U.S. at 177, 101 S.Ct. at 460.

9. Applying the rational basis standard here, the fact that the municipal counterdefendants permit special outreach efforts by local governments and non-profit fair housing centers does not offend counterplaintiffs' right to equal protection. Counterdefendants' interest in permitting such efforts—the promotion of diverse integrated communities—is, of course, legitimate. *See, Trafficante,* 409 U.S. 205, 93 S.Ct. 364; *Gladstone,* 441 U.S. 91, 99 S.Ct. 1601; *Barrick,* 491 F.2d 161. Specifically, authorizing outreach efforts by towns or fair housing centers is rationally related to that interest. This conclusion is buttressed by the State of Illinois' specific authorization of such efforts by local governments. Ill. Rev.Stat., ch. 68, ¶ 7–108(D); ch. 24, ¶ 11–11.1–1 (1985). Indeed, given the reality of the dual housing market, diverse integration may not be possible absent such outreach efforts. At a bare minimum it cannot be the case that such efforts either are patently arbitrary or an irrational means of accomplishing the stated interest. No greater showing is required here to defeat counterplaintiffs' equal protection claim. *Vaden,* 809 F.2d at 365.

10. Nor is the equal protection clause offended by the fact that the Model Ordinance communities prohibit panic peddling for profit and prohibit steering by providers of real estate agent services. Just as Congress in the Fair Housing Act prohibited "for-profit" panic peddling, the municipalities may make the rational determination that panic peddling for profit is most destructive of residential integration. The rational basis for applying the prohibition of steering to real estate providers is equally clear: real estate agents by the intrinsic nature of their business are in daily contact with homesellers and homeseekers. It is surely rational to aim the prohibition on steering at those whose economic and professional positions place them in such direct and frequent contact with those who are subject to steering.

## CONCLUSIONS

1. The court finds in favor of the counterdefendants and against the counterplaintiffs on Counts I, II, V and VI.

2. The court finds in favor of counterplaintiffs and against counterdefendant Hazel Crest on Count III and declares the provisions of Ordinance No. 9–1983, Divn. 6, § 14–34, unconstitutional and null and void.

3. The court finds in favor of all other counterdefendants and against counterplaintiffs on Count III.

4. The court finds in favor of counterplaintiffs and against counterdefendants on Count IV and declares the anti-solicitation ordinances of counterdefendants unconstitutional insofar as they prohibit forms of communications from realtors to signators of the municipal anti-solicitation lists other than solicitations actually seeking to induce the sale, rental or listing of dwellings.

IT IS SO ORDERED.

## ON MOTION TO ALTER OR AMEND

I. Post–Trial Motion of Plaintiff South Suburban Housing Center

Plaintiff, South Suburban Housing Center ("SSHC"), has moved under Fed.R.Civ. P. 59(e) to alter or amend the court's December 19, 1988 Findings of Fact and Conclusions of Law. It is the expressed intent of SSHC that the court make only changes of a clarifying nature, to correct typographical errors, or to amplify on certain findings and not to seek to have the court alter its ultimate Findings of Fact and Conclusions of Law. Defendants, Greater South Suburban Board of Realtors ("GSSBR") and National Association of Realtors ("NAR"), object to all changes either as unnecessary or as being changes of substance. After reviewing the requests the court declines to make the changes proposed in paragraphs 1, 2, 5, 6, 7 and 8 of SSHC's motion but has changed and substituted Finding of Fact No. 11.

## II. Municipalities' Motion

The municipal counterdefendants move the court pursuant to Rule 59(e) of the Fed.R.Civ.P. to amend its judgment and certain of its Findings of Fact and Conclusions of Law only relative to the First Amendment challenge to the municipal counterdefendants' solicitation ordinance (counterclaim, Ct. IV).

Basically the municipalities contend that the court's finding that the solicitation ordinances were unconstitutional because as more extensive than necessary to advance their purposes and were unconstitutionally vague, should be reconsidered in light of the Supreme Court decision of *Rowan v. U.S. Post Office*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), and the Seventh Circuit decision of *Curtis v. Thompson*, 840 F.2d 1291 (7th Cir.1988).

In *Rowan* the Supreme Court specifically upheld the constitutionality of a federal statute that empowered the post office upon the request of an individual to require that a sender of unsolicited mail remove the name and address of the individual from its mail lists. The *Rowan* case was cited as controlling by the lead opinion in *Curtis,* which upheld the Illinois statute making it a crime to solicit the sale of residential real estate once the owner has given notice that he does not desire to sell (Ill.Rev.Stat., ch. 38, § 70–51(d)). However both the concurring opinion and the dissenting opinion in *Curtis* distinguished *Rowan* as not being controlling authority (although the concurring opinion felt that *Rowan* was "helpful.")

The court does not find *Rowan* or *Curtis* as authority for the municipalities' position. *Rowan* upheld a statute that permitted a resident to insulate himself from a particular mailer without regard to the content of the mailing. Here, in contrast, the ordinances exclude an entire class of mailers based upon occupation and content. In *Curtis* the plaintiff sought a preliminary injunction barring enforcement of the Illinois Anti–Solicitation Law. The trial court denied the preliminary injunction without holding an evidentiary hearing on the ground that the plaintiff had failed to demonstrate the likelihood of success on the merit. The plaintiff in *Curtis* sought what she claimed was "her First Amendment right to contact homeowners for the purpose of persuading them to sell or list their homes." *Id.,* p. 1297. The court did apply *Central Hudson Gas v. Public Service Com'n of N.Y.,* analysis, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) which resulted in an extremely narrow holding: "Once actual notice is received by a real estate agent, that agent is barred from contacting the homeowner *for the purpose of persuading him or her to list the residence for sale." Id.,* p. 1304 (emphasis supplied). The Seventh Circuit therefore was not faced with an anti-solicitation ordinance that barred virtually all forms of communication from all realtors to homeowners. Here the court did no more than the majority approval in *Curtis:* a declaration that municipalities had power to prohibit solicitations to sell.

The court therefore denies the motion of the municipalities.

## III. GSSBR and NAR Post–Trial Motion

Defendants/counterplaintiffs, GSSBR and NAR (collectively "NAR"), move to amend the judgment pursuant to Rule 59(e) of the Fed.R.Civ.P. and to amend the Findings of Fact and Conclusions of Law pursuant to Rules 59(a) and 60(a) and to amend their second amended complaint, Count VI, to conform to the proof at trial.

### A.

The court's judgment of December 19, 1988 inadvertently omitted any rulings on Counts I, II and III of the complaint of plaintiff, SSHC. As pointed out by NAR, the court addressed each of SSHC's counts in the opinion and dismissed the counts in the body of the opinion (p. 1081). Accordingly, the court's judgment is entered in favor of defendants, GSSBR and NAR, and against plaintiff, SSHC, on Counts I, II and III of SSHC's complaint.

### B. *Count VI*

NAR points out that the steering ordinances addressed by the court in its opinion at pages 1098–1101 were not the ones in

effect at the time of the trial. These ordinances were however the ones challenged in NAR's second amended counterclaim at paragraphs 78–83. The second amended counterclaim was the pleading at issue at the time the parties went to trial. Fed.R. Civ.P. 15(b) permits post-judgment amendments on the pleadings to conform to the evidence only when the "issues not raised by the pleadings are tried by express or applied consent of the parties." The record of this case is devoid of any evidence of express or applied consent of the municipality. In fact the municipalities filed their proposed Findings of Fact and Conclusions of Law regarding Count VI in conformance with the issues raised by the second amended counterclaim.

In any event the Fair Housing Ordinances which were in effect at the time of the trial are clearly not preempted by the Fair Housing Act. 42 U.S.C.A. § 3615 only invalidates ordinances that purport to require or permit actions that would be a discriminatory housing practice under the Fair Housing Act. None of the ordinances challenged (MX2, MX104, MX277 and MX382) violate the Fair Housing law. The gravemen of defendants' argument is that affirmative marketing, described by NAR as "benign steering", permitted by the Fair Housing Ordinances is a violation of 42 U.S.C. § 3604(e). However the court in its Findings of Fact and Conclusions of Law concerning the Fair Housing Act claims against affirmative marketing (Counts I and II, *see* pp. 1086–88) found no Fair Housing Act violation involved in that type of conduct. Accordingly, the court denies NAR's motion to file the amendment to its second amended complaint to vacate its Findings of Fact and Conclusions of Law on Count VI.

### Count III of the Second Amended Counterclaim

NAR moves the court to set aside its Findings of Fact and Conclusions of Law on the Village of Country Club Hills' sign permit and fee ordinance. NAR argues that the Country Club Hills' sign ordinance is specifically limited to real estate "for sale" signs, is not content neutral, and therefore the court time, place, or manner analysis is incorrect.

However the evidence submitted showed that Country Club Hills charged a fee and required an application for a permit for other commercial signs in residential areas (Country Club Hills Code, Art. 11, § 15.11.08(1), MX598 and MX599). There was no evidence that the fees charged exceeded the administration costs. Accordingly, the motion of NAR to vacate the judgment in favor of the municipalities on Count III of the second amended counterclaim is denied.

At the suggestion of the realtor the court has looked at Finding No. 9 on page 1080 of the court's December 19, 1988 opinion. It was the intent of the Finding of Fact that the relief sought, being the forced inclusion of listing agreements into defendant's MLS, would affirmatively further fair housing activity although the court did not feel that this was a severe intrusion into defendants' rights. Accordingly, the factor was not determinative. *Arlington Heights,* at 1295.

IT IS SO ORDERED.